# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 Cases |
| PERPETUA-BURR OAK HOLDINGS OF ) | |
| ILLINOIS, L.L.C., *et al.,* ) | Case No. 09-34022 |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | Hon. Pamela S. Hollis |
| ) | |
| ) | Objection Deadline: March 30, 2010 |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on April 1, 2010 at 11:00 a.m., the undersigned shall appear before the Honorable Pamela S. Hollis, in Courtroom 644, 219 South Dearborn Street, Chicago, Illinois, and then and there present the DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING (A) SALE OF OPERATING ASSETS OF CEDAR PARK AND BURR OAK BUSINESSES, (B) TERMS OF SALE AGREEMENT, (C) SALE TERMS AND BIDDING PROCEDURES, BREAK UP FEE AND AUCTION NOTICE AND (D) RELATED RELIEF**,** at which time you may appear if you deem fit.

Dated: March 22, 2010

Respectfully submitted,

Perpetua, Inc.
Perpetua Holdings of Illinois, Inc.
Perpetua-Burr Oak Holdings of Illinois, L.L.C.

By:     */s/ Brian L. Shaw*
         One of their attorneys

Robert M. Fishman (#3124316)
Brian L. Shaw (#6216834)
Kimberly Bacher (#6285677)
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654
(312) 541-0151  telephone
(312) 980-3888  facsimile

{7236 MOT A0254776.DOC}

# CERTIFICATE OF SERVICE

Brian L. Shaw certifies that he caused to be served a true copy of the above and foregoing DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING (A) SALE OF OPERATING ASSETS OF CEDAR PARK AND BURR OAK BUSINESSES, (B) TERMS OF SALE AGREEMENT, (C) SALE TERMS AND BIDDING PROCEDURES, BREAK UP FEE AND AUCTION NOTICE AND (D) RELATED RELIEF upon the attached Service List via in the manner so indicated on this 22nd day of March, 2010.

/s/ *Brian L. Shaw*

***Mailing Information for Case 09-34022, Electronic Mail Notice List***
The following is the list of **parties** who are currently on the list to receive e-mail notices for this case.

- Kimberly A Bacher    kbacher@shawgussis.com
- Sisavanh B Baker    sibaker@cookcountygov.com
- Aaron R. Bilton    aaronbilton@ameritech.net
- Michael F Bonamarte    mfb@levinperconti.com
- Carl B Boyd    starksboyd@sbcglobal.net
- Patience R Clark    prc@clarklawchicago.com
- Nathan F Coco    ncoco@mwe.com
- Joseph R Curcio    info@curcio-law.com, kmillan@curcio-law.com
- Yao O Dinizulu    dinizulu@dinizululawgroup.com
- Faith Dolgin    faith.dolgin@illinois.gov
- Robert M Fishman    rfishman@shawgussis.com
- Arthur S Gold    asg@gcjustice.com, carla@gcjustice.com
- Jamie G Goldstein    jgoldstein@gdmlawfirm.com
- Kenneth T Goldstein    ken@krislovlaw.com, ecf@krislovlaw.com
- Blake W Horwitz    bhorwitz@hrbattorneys.com, sboshears@rsbmlaw.com
- Gregory J Jordan    gjordan@jka-law.com
- Dan Klein    dakchicago@yahoo.com
- Robert D Kreisman    bob@robertkreisman.com
- Clinton A Krislov    clint@krislovlaw.com
- Vincent E. Lazar    vlazar@jenner.com, lyap@jenner.com;docketing@jenner.com
- Anthony J Masciopinto    amasciopinto@kmklawllp.com
- James D. Montgomery    james2@jdmlaw.com
- William T Neary    USTPRegion11.ES.ECF@usdoj.gov
- Thomas Plouff    tom@alabama-attorney.net
- Elliot Pollock    pollocklaw@sbcglobal.net, rettigb@hotmail.com
- Scott C Polman    spolman.law@comcast.net
- Joseph A Power    joepower@prslaw.com, dkroger@prslaw.com
- Michael R Richmond    mrichmond@hellerrichmond.com
- Aron D Robinson    adroblaw@aol.com
- Richard A. Saldinger    rsaldinger@shawgussis.com
- Brian L Shaw    bshaw100@shawgussis.com, bharrington@shawgussis.com
- Zachary K. Sims    zacharysims@aol.com

{7236 MOT A0254776.DOC}

- Kathleen A Stetsko   kstetsko@perkinscoie.com, docketchi@perkinscoie.com
- Daniel A Zazove   docketchi@perkinscoie.com
- Thomas A Jr Zimmerman   tom@attorneyzim.com

**Via Email**

James H. Adams   jadams@sbicreceivership.com
John J. Piegore   jpiegore@sanchezdh.com
William S. Schwartz   wschwartz@lplegal.com

**Via U.S. Mail**

CNH Capital America LLC
100 Brubaker Avenue
New Holland, PA 17557-0000

1st Source Bank
P.O. Box 783
South Bend, IN 46624-0000

Department of the Treasury-
Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114

Illinois Department of Revenue
Bankruptcy Section
Level 7-425
100 W. Randolph Street
Chicago, IL 60101

Cook County Assessor
118 N. Clark Street
Room 314
Chicago, IL 60602

Cook County Treasurer
118 N. Clark Street
Room 212
Chicago, IL 60602

{7236 MOT A0254776.DOC}

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Cases |
| | ) | |
| PERPETUA-BURR OAK HOLDINGS OF | ) | Case No. 09-34022 |
| ILLINOIS, L.L.C., *et al.,* | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Pamela S. Hollis |
| | ) | |
| | ) | Objection Deadline: March 30, 2010 |

**DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING (A) SALE OF OPERATING ASSETS OF CEDAR PARK AND BURR OAK BUSINESSES, (B) TERMS OF SALE AGREEMENT, (C) SALE TERMS AND BIDDING PROCEDURES, BREAK UP FEE AND AUCTION NOTICE AND (D) RELATED RELIEF**

Perpetua Holdings of Illinois, Inc. d/b/a Cedar Park Cemetery ("**Cedar Park**") and Perpetua Burr-Oak Holdings of Illinois, L.LC. d/b/a Burr Oak Cemetery ("**Burr Oak**", collectively, with Cedar Park, the "**Debtors**"), for their motion for the entry of an order approving (a) sale of operating assets of Cedar Park and Burr Oak Businesses, (b) terms of Agreement, (c) Terms and Bidding Procedures, Break Up Fee and Auction Notice and (d) related relief ("**Sale Motion**"), respectfully state as follows:[1]

## I. JURISDICTION AND BACKGROUND

**A.     The Chapter 11 Filing**

1.     On September 14, 2009 (the "**Petition Date**"), the Debtors, along with their parent company, Perpetua, Inc.  "**Perpetua"**), each filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), thereby commencing the above-captioned cases (the "**Cases**").  The

---

[1] Defined terms in this preamble have the meaning proscribed to them in the body of the Sale Motion.

{7236 MOT A0254776.DOC}

Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. The United States Trustee has appointed a creditors' committee in the Cases. No trustee or examiner has been appointed.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.     Background**

4. Perpetua was organized under the laws of the state of Florida in 1998. Perpetua (a) owns all of the capital stock of (i) Cedar Park and (ii) Perpetua Holdings, Inc. d/b/a Wade Funeral Home ("**Wade**") (a non-debtor affiliate) and (b) holds all of the common interests in Burr Oak. Perpetua provides administrative, managerial and other support services to Cedar Park, Burr Oak and Wade. Perpetua's subsidiaries' cemeteries and funeral homes principally serve minority communities in the Chicago and St. Louis metropolitan areas.

5. Cedar Park was organized under the laws of Illinois in 2004, at which time it acquired the Cedar Park Cemetery. Cedar Park owns and operates an active cemetery and funeral home located at 12540 S. Halsted, Calumet Park, Illinois (the "**Cedar Park Business**"). Cedar Park maintains an office on site.

6. Burr Oak was organized under the laws of Illinois in 2001, at which time it acquired the Burr Oak Cemetery. Burr Oak owns and operates an active cemetery located at 4400 W. 127th Street, Alsip, Illinois (the "**Burr Oak Business,**" together with the Cedar Park Business, the "**Businesses**"). Burr Oak maintains an office on site.

7. PSF and MESBIC Ventures, Inc. ("**MESBIC**," along with PSF, the "**Secured Creditors**") are lenders to and hold certain equity-type investments in the Debtors and Perpetua.

8. Previously, the Debtors and Perpetua obtained post-petition secured financing in an amount up to $575,000 from PSF (the "**PSF Facility**"), subject to the terms and conditions set forth in the Final Order (I) Authorizing Debtors To Obtain Secured Post-Petition Financing, (2) Granting Priming Liens, Superpriority Administrative Expense Status, And Adequate Protection, (3) Modifying The Automatic Stay, And (4) Authorizing Debtor To Enter Into Post-Petition Agreements With Its Lender (the "**PSF Order**"). Pursuant to the terms of the PSF Order, the security interest granted thereunder primed those of the Secured Lenders.

9. Subsequently, the Debtors and Perpetua obtained an additional $500,000 in post-petition secured financing from the trustees ("**Trustee-Lenders**") of Burr Oak's and Cedar Park's respective perpetual care trusts (the "**Trust Facility**"), which amount was apportioned equally between the two perpetual care trusts and subject to the terms of the Final Order (1) Authorizing Debtor To (A) Obtain Additional Postpetition Financing And (B) Granting Superpriority Administrative Expense Claims, Priming Liens And Security Interests And Adequate Protection And (2) Granting Related Relief (the "**Trust Order**"). Pursuant to the terms of the Trust Order, the security interests granted to the Trustee-Lenders thereunder attached to substantially all of the assets of the Debtors and Perpetua and primed those of the Secured Lenders and those granted under the PSF Order.

10. The Debts owed to the Secured Lenders, PSF and the Trustee-Lenders are secured by the assets which the Debtors seek authority to sell through the Sale Motion.

11. In October, 2009, the Debtors were authorized to employ American Cemetery/Mortuary Consultants, Inc. ("**ACMC**") as their business consultants to market and sell the Burr Oak and Cedar Park Businesses. Since that time, ACMC, with the assistance of the Debtors, has marketed both Businesses for sale, which efforts have included the following the preparation and dissemination of sales booklets for each Business and the personal contact of 24

potentially interested parties. The Debtor received four offers for one or both Businesses as a result of ACMC's efforts.

12. After a review of the resulting offers, the Debtors, subject to Court approval, have received and accepted a stalking horse offer for both Businesses (the "**Agreement**") from Cemecare, LLC ("**Buyer**") for the purchase price of $675,000 plus the assumption of certain customer related obligations. A true and correct copy of the Agreement is attached hereto as Exhibit A.

## II. THE TERMS OF THE AGREEMENT

13. On or about March 15, 2010, the Debtors entered into the Agreement with Buyer for the sale of the Burr Oak and Cedar Park Businesses. The principal terms of the Agreement are as follows:

  a. The Buyer has offered to pay the Debtors **$675,000** for both Businesses, of which $25,000 is apportioned for the sale the Burr Oak Business ("**Burr Oak Purchase Price**") and $650,000 is apportioned for the sale of the Cedar Park Business (the "**Cedar Park Purchase Price**," collectively with the Burr Oak Purchase Price, the "**Purchase Price**"). The Agreement also requires the Buyer to assume certain customer obligations of the Burr Oak and Cedar Park Businesses, as set forth in more detail in the Agreement. The Agreement requires the Buyer to make an initial earnest money deposit of $60,000 ("**Earnest Money Deposit**") in support of Buyer's obligations under the Agreement. Prior to the filing of the Motion the Buyer made tendered the Earnest Money Deposit to the Debtors.

  b. The Agreement provides for the conveyance of the Estate's right, title and interest in the real and personal property of the Businesses to Buyer, subject to the Debtors rights to sell the Businesses separately to different parties and/or to withdraw the Burr Oak Business from the Auction (as defined and described below).

  c. The Agreement has a Due Diligence Period that expires on March 30, 2010 and is subject to no further contingencies other than (a) Debtors' required deliveries at closing and (b), subject to Purchaser's representation and warranty requirements, the extension of the Closing Date if there is a delay in Purchaser's receipt of any necessary licenses and permits.

  d. The Agreement requires that an order be entered approving the Terms and Procedures on or before April 8, 2010. The Agreement further provides that an order approving the sale that complies with the terms of the Agreement be entered

      on or before May 6, 2010, and that the closing of the sale under the Agreement occur no more than seven days thereafter, and not later than on May 7, 2010.

e.    The Agreement allows the Debtors to place both the Cedar Park Business and Burr Oak Business up for Auction separately or in a single lot, and allows for neither, one or both Businesses to still be sold to Buyer at the conclusion of the Auction and further allows the Debtors to withdraw the Burr Oak Business from the Auction.

### III. TERMS AND PROCEDURES OF THE AUCTION

12.    The material terms of the Auction are as follows:

a.    The Agreement recognizes, and is expressly subject to, the right of the Debtors to further market and offer the Cedar Park and Burr Oak Businesses to other parties at an auction sale (the "**Auction**") in two distinct lots and in a single lot. This Sale Motion contemplates that the Debtors will offer the Businesses for sale at the Auction, subject to the Debtors right to withdraw the Burr Oak Business from the Auction and the Terms and Procedures as set forth below. As soon as practicable after the conclusion of the Auction, the Debtors, in consultation with ACMC, their CRO and his consultant (a) shall consult and review each Qualified Bid (as defined below) on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummation of the transaction(b) shall determine, in its business judgment, which Qualified Bid or Bids are the highest or otherwise best offer(s) (the "**Winning Bid**"), and the bidder(s) making the Winning Bid(s) (the "**Winning Bidder**"), and (c) reject at any time before entry of a Sale Order, any bid that, in the Debtors' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Estate and its creditors (the "**Bid Analysis**").

b.    The Debtors further propose that the terms, conditions and procedures contained in this motion and as principally set forth immediately below (the "**Terms and Procedures**") should govern the Auction, and that this court should enter an order to that effect forthwith (the "**Procedures Order**"):

c.    Any competitive bidding for the Businesses shall be conducted at the Auction to be held at the offices of Shaw Gussis Fishman Glantz Wolfson & Towbin LLC at 1:30 p.m. on April 26, 2010, after which the Court shall enter an order in form and substance reasonable acceptable to Purchaser authorizing the sale of the Businesses free and clear of liens, claims and encumbrances (other than the Permitted Exceptions) (the "**Sale Order**"), which proposed Sale Order shall be submitted to and filed with the Court not less than five days prior to the Sale Hearing (as defined below). At the Auction, the Debtors shall conduct the sale by open bidding, except that nothing contained in the Procedures Order or elsewhere shall prohibit the Debtors, at the Auction, from conducting separate or joint discussions with the Buyer, any Qualified Bidder (as defined below) or any

{7236 MOT A0254776.DOC}           5

    creditor or their representatives in private and not on the record of such proceeding. A court reporter shall make a record of the open bidding as it occurs.

d.     Unless otherwise ordered by the Court for cause shown, for any person to participate in the Auction (a "**Potential Bidder**"), on or before 1:30 p.m. (CDT) p.m. on April 23, 2010 ("**Bidding Deadline")**, such person must deliver to the Debtors (in care of their counsel) (i) such information as the Debtors shall request establishing a Potential Bidder's (as defined in the Agreement) ability to close the Sale of the Businesses in a timely manner, including a demonstration of financial wherewithal to close such sale; (ii) a cashier's or certified check made payable to the Debtors for funds equal to the amount equal to 7.5% of its Qualified Bid; (iii) a list of Contracts that it wishes to assume over and above the Assumed Obligations set forth in the Agreement; and (iv) an executed sale agreement for one or both Businesses in substantially the same form as this Agreement (though absent any bid protection, auction and bid procedures or contingency periods), in form and substance acceptable to the Debtors. Any Potential Bidder meeting all of the above requirements that wishes to participate in the Auction must attend the Auction in person, or by telephone, and acknowledge in writing that it is familiar with, understands and accepts the procedures specified in the Terms and Procedures Order. Any person qualifying under all of the above standards shall be entitled to bid to purchase the Businesses and will be hereinafter referred to as a "**Qualified Bidder**." Any bid made by a Qualified Bidder shall be referred to as a "**Qualified Bid**."

e.     A copy of the Terms and Procedures shall be served with the Notice of Auction Sale respecting the Auction (the "**Auction Notice**") and served pursuant to the procedures described in this Motion. The Auction Notice shall specify the Auction Date and the time and place of the Auction.

f.     The Debtors may grant reasonable access to the Businesses to any person expressing an interest in viewing the same for the purpose of making a bid thereon, and the Debtors will further agree to make financial and such other information concerning the Businesses available to any prospective bidder. The Debtors shall require any prospective bidder to enter into a confidentiality agreement (if it has not already done so), in form and substance no less restrictive than the confidentiality agreements executed by Buyer.

g.     The Debtors will offer the Businesses for sale at the Auction in conformity with these Terms and Procedures and the Procedures Order. At the conclusion of the Auction, the Debtors will undertake the Bid Analysis to determine which Qualified Bid(s) is or are, the Winning Bid(s). At the conclusion of the Bid Analysis, the Debtors shall ask the Court to enter an order (in form and substance substantially similar to the Sale Order and reasonably satisfactory to the Winning Bidder) authorizing the Debtors to consummate the transaction in accordance with the Winning Bid(s) with the Winning Bidder(s) and to execute such additional documentation as is reasonably necessary to close such Sale (as defined below).

h. The Procedures Order will include a requirement that an Auction shall be conducted (a) for the Cedar Park Business, if any Qualified Bid for the Cedar Park Business has a cash value that exceeds the Purchase Price by at least $35,000, (b) for the Burr Oak Business, if any Qualified Bid for the Burr Oak Business has a cash value that exceeds the Burr Oak Purchase Price by $5,000 or (c) for both Businesses, if the aggregate amount of the highest Qualified Bid for each of the Businesses has a cash value that exceeds the Purchase Price by $35,000. Subsequent bids for either the Cedar Park Business, alone, or both Businesses together, shall be in increments not less than $10,000.00. Subsequent bids for the Burr Oak Business, alone, shall be in increments of $5,000. If Qualified Bids for either or both Businesses do not reach the thresholds set forth above, subject to the Debtors right to withdraw the Burr Oak Business from the Auction, Buyer will be deemed to be the Winning Bidder for the Business (or Businesses) for which no Auction is held.

i. The offers of all Qualified Bidders shall be irrevocable until the earlier of the (i) two business days after the Closing of the sale on the applicable Business or (ii) the withdrawal of the applicable Business for sale by the Debtors. Earnest Money Deposits for Qualified Bidders that do not become Winning Bidders shall be returned upon the Qualified Bidder's offer becoming revocable pursuant to the terms of this paragraph.

j. In the event that a Winning Bidder defaults in the performance of its obligation to purchase the applicable Business pursuant to a Winning Bid, the Winning Bidder's Earnest Money Deposit shall be forfeited.

k. In the event that a Winning Bidder defaults in the performance of its obligations to purchase the applicable Business pursuant to a Winning Bid, then the next highest bidder for that Business shall be the Winning Bidder. Consequently, that person's bid (the "**Back-Up Bid**") will be treated as the Winning Bid, without further notice, hearing or entry of additional order by the Court.

l. Any sale of the Businesses hereunder (the "**Sale**") shall be free and clear of all liens, claims and encumbrances other than the Permitted Exceptions (unless otherwise agreed to by such Winning Bidder and the Debtors), with such liens and interests attaching to the proceeds of the Sale (the "**Sale Proceeds**") in the same status and priority as those liens and interests enjoyed prior to the Auction and Sale. The Sale Order shall expressly so provide.

m. The sale of the Businesses shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, the Estates, or their respective agents. By submitting a bid, each Qualified Bidder shall be deemed to have acknowledged and represented that (i) it has had an opportunity to inspect and examine the Businesses and to conduct any and all due diligence regarding the Businesses prior to making its bid; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents and the Businesses in making its bid; and (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties

{7236 MOT A0254776.DOC}　　　　　　　　　　　7

        whatsoever, whether express, implied, by operation of law or otherwise, regarding the Businesses by any person whatsoever, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or, as to the Winning Bidder, the applicable purchase agreement.

n.    Notwithstanding anything to the contrary in this Order or the Agreement, a Winning Bid shall have been accepted by the Debtors only upon entry of the Sale Order and the Debtors will not be obligated to take any action related to the sale of the Businesses unless and until the Court enters the Sale Order. The Debtors' presentation to the Court for approval of a Winning Bid does not constitute the Debtors' acceptance thereof.

o.    Upon the Court's entry of the Sale Order, a Winning Bidder(s) (which may be the Buyer) shall become a "**Purchaser**."

p.    In the event the Debtors enter into a transaction not in the ordinary course of its business for the sale of the Cedar Park Business (alone or together with the Burr Oak Business) to someone other than Buyer, and provided that Buyer is not otherwise in default or has not terminated the Agreement for any other reason, Buyer shall be paid a "break-up" fee in an amount equal to $25,000, (the "**Break-Up Fee**" and together with the provisions of (g) above, the "**Bid Protections**"), which amounts will be paid by the Debtors from the Closing of a Sale approved by the Court to a Purchaser other than the Buyer.

13.    To the extent that a Break-Up Fee is paid to the Buyer in connection with the Bidding Procedures, such Break-Up Fee must remain free and clear of any claim or lien of the secured creditors. *See CXM, Inc.*, 307 B.R. 94 (Bankr. N.D. Ill. 2004).

### IV. SALE HEARING

14.    At the conclusion of the Auction, and as soon as the Debtors have determined which persons are the Winning Bidder(s), the Debtors shall present the Winning Bid(s) to the at a hearing before the Court (the "**Sale Hearing**") and request the entry of the Sale Order containing all approvals and authorizations that, in the Debtors' judgment, are necessary to effectuate and consummate the transactions set forth in the Winning Bid(s). The Debtors shall also seek a finding in the Sale Order that the Purchaser(s) are good faith purchasers.

15.    Notwithstanding anything to the contrary in this Sale Motion or the Agreement, a Winning Bid will have been accepted by the Debtors only upon entry of the Sale Order and the

Debtors will have no obligation to any entity, nor be obligated to take any action related to the sale of the Businesses, unless and until the Court enters a Sale Order or Orders satisfactory to the Debtors. The Debtors presentation to the Court for approval of the Winning Bid does not constitute the Debtors' acceptance thereof.

## V. THE RELIEF REQUESTED

16. By this motion, the Debtors respectfully request that the Court immediately enter the Procedures Order in the form attached to this Sale Motion, that provides essentially for the following relief:

    a. Approves the Bidding Procedures for the sale of the Businesses;

    b. Approves the Agreement in the form of that attached to this Sale Motion for use in connection with the sale of the Businesses;

    c. Approves the provision for the Break-Up Fee and other Bid Protections in favor of Buyer under the terms of the Agreement in the event Buyer is not the Successful Bidder for the Cedar Park Business;

    d. Requires the Debtors to file a form of proposed Sale Order with the Court on or before April 20, 2010;

    e. Requires objections to the entry of the Sale Order to be filed with the Court on or before April 23, 2010;

    f. Sets the time for the Auction as 1:30 p.m. CDT, Monday, April 26, 2010 and the place for the Auction as the offices of the attorneys for the Debtors, Shaw Gussis Fishman Glantz Wolfson & Towbin LLC, 321 N. Clark Street, Suite 800, Chicago, IL 60654;

    g. Sets a Sale Hearing to be held, subject to the Court's availability, on April 27, 2010, at which time the Debtors will seek the entry of the Sale Order; and

    h. Approves the Auction Notice and proposed advertising.

## VI. BASIS FOR RELIEF REQUESTED

17. As stated above, after extensive marketing efforts, the Debtors believes that the sale of the Businesses to Buyer, subject to the Auction, represents the best opportunity under the very difficult circumstances of these Cases to maximize the value of this particular property.

The Debtors have reached this conclusion, based on the exercise of its business judgment, after consultation with ACMC, the Businesses' CRO and his consultant. Accordingly, the Debtors respectfully submit that entry of the Procedures Order and the Sale Order are in the best interests of the Debtors' bankruptcy estates ("**Estates**") and its creditors and should be approved.

### Sale Under Section 363(B)(1)

18. Section 363(b)(1) permits a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. "[T]he sale of substantially all of a debtor's assets is a transaction outside of the ordinary course of business, which requires bankruptcy court approval to become effective." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 531 (3rd Cir. 1999).

19. Courts generally approve sales outside of the ordinary course of business under § 363(b)(1) whenever such a sale is in the best interests of the estate. *See, In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994); *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988). Ordinarily, this standard requires: (i) an articulated business justification for the sale; and (ii) evidence that the sale occurred in good faith. *See, In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993), citing, *In re Met-L-Wood Corp.*, 861 F.2d 1012 (7th Cir. 1988), *cert. denied*, 490 U.S. 1006, 109 S. Ct. 1642, 104 L.Ed.2d 157 (1989)); *see also, Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (sale under §363 involves exercise of fiduciary duty and requires an "articulated business justification").

20. Additionally, courts generally require that adequate and reasonable notice of the sale be provided to interested parties, and that the purchase price be fair and reasonable. *See, In re Delaware & Hudson Rwy. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Taylor*, 198 B.R. 142, 156-57 (Bankr. D. S.C. 1996); *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr. N.D. Ohio 1994).

21.     The Debtors believe that the facts and circumstance that led to the commencement of these Cases and the need to sell the Businesses are exceptionally difficult and justify all of the relief requested herein.  The same facts and circumstances, as well as the subsequent change of the laws regarding the maintenance and operations of cemeteries in the state of Illinois have materially affected the marketability of the Businesses and evidence the hurdles that have been overcome to put the proposed Sale and Auction before the Court.  For these reasons, and the reasons se out more fully below, the Debtors believe that the relief requested herein meets the requisite standards set forth above and should be granted.

### Section 363(M) Good Faith Purchaser Designation

22.     Further, the Debtors and the Buyer will request that the Court make a finding that: (i) the Buyer acted in good faith in negotiating the sale price; (ii) the Notice Procedures provided sufficient notice for entry of the Sale Order; and (iii) the sale price is fair and reasonable.

23.     Section 363(m) of the Bankruptcy Code, which pertains to a sale such as that proposed in this Motion, incorporates the term **"good faith"** as a requirement.  Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property **in good faith**, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added.).

24.     A good faith purchaser under Section 363(m) has been defined in the case law to mean "one who purchases in 'good faith' and for 'value.'" *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997), citing, *Cumberland Farms Dairy, Inc. v. National Farmers' Org. (In re Abbotts Dairies of Penn., Inc.)*,

{7236 MOT A0254776.DOC}                                11

788 F.2d 143, 147 (3d Cir. 1986)); *see, Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992); *Badami v. Burgess (In re Burgess)*, 246 B.R. 352, 355-56 (B.A.P. 8th Cir. 2000).

25. As the United States Court of Appeals for the Seventh Circuit stated in *In re Rock Industries Machinery Corp.*, 572 F.2d 1195 (7th Cir. 1978), the "good faith" component of the test:

> speaks to the equity of [the bidder's] conduct in the course of sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

Id. at 1198; *see, Kabro Assocs.*, 111 F.3d at 276; *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs. (In re Mark Bell)*, 992 F.2d 7, 8 (1st Cir. 1992); *In re Ewell*, 958 F.2d at 281.

26. With respect to the proposed transaction, the Debtors will request a finding if they believe the Purchaser qualifies for designation as a good faith purchaser. In this respect, the Debtors may provide testimony that the Debtors have at all times in the sales process and Auction acted in good faith. Accordingly, at the Sale Hearing, the Debtors will request that the Court designate the Purchaser as a good faith purchaser, as such term is used in Section 363(m).

**The Notice and Advertising Procedures**

27. Upon entry of the Procedures Order, the Debtor will cause the Auction Notice (a copy of which is attached hereto as Exhibit B) to be served upon: (a) all of the Debtor's creditors; (b) all entities known to have expressed a substantial interest in purchasing the Businesses; (c) all other entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Businesses or their real or personal property; (d) the Committee and its counsel; (e) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; and (f) the United States

Debtors. Subsequent to such service of the Auction Notice, the Debtors shall provide the Auction Notice to any party requesting in writing a copy of the same. The Debtors request that such Notice be deemed proper and sufficient notice.

28. In addition, the Debtors request the authority the place the Auction Notice in the auction section of the Chicago Tribune and the notice section of the Chicago Defender and Daily Southtown at least seven days prior to the Auction Date.

29. The Debtors believe that if the Notice and Advertising Procedures are approved and authorized, creditors and other parties in interest will receive adequate notice of the sale. Under these procedures, notice of the sale is reasonably calculated to provide timely and adequate notice to those parties most interested in the Case, and those parties potentially interested in bidding for the Businesses.

### Break-Up Fee

30. "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *In re Integrated Resources, Inc.*, 147 Bankr. 650, 653 (S.D.N.Y. 1992), app. dismissed on jurisdictional grounds, 3 F.3d 49 (2nd Cir. 1993). Outside of bankruptcy, the courts have dealt with the concept of break-up fees and other bidding incentives in merger and acquisition cases, in which break-up fees are often part of the deal. The break-up fee is designed in part to compensate for the risk of losing a signed deal. *Beebe v. Pacific Realty Trust*, 578 F. Supp. 1128, 1150 n.7 (D. Or. 1984).

31. Generally, break-up fees are allowed as long as they "enhance" the bidding, and are reasonable in relation to the bidder's efforts and the size of the transaction. As long as procedural safeguards accompanied the approval of the bidding incentive by the board of directors, those bidding incentives will not be disturbed by the courts. The Court should

{7236 MOT A0254776.DOC} 13

consider the potential buyer's investment of both time and money when determining whether a break-up fee is reasonable. In addition, the Court should also consider the difficult circumstances under which the Businesses have been marketed and which requires the Debtors to sell or otherwise there ownership interests in the same.

32. In general, a break-up fee is permissible if reasonably related to the bidder's efforts and the transaction's magnitude. *Cottle v. Storer Communication Inc*., 849 F.2d 570, 578 (11th Cir. 1988). This approach encourages the appropriate level of bidding. If a prospective bidder knows that a debtor will agree to and seek court approval of a break up fee after the bidder has investigated the debtor, the bidder is more likely to pursue a bid. If, on the other hand, a prospective bidder knows that courts prevent the debtor from paying a break-up fee, then it is more likely to abandon its bid, or, even worse, never to explore a bid in the first place. *In re Integrated Resources* 147 B.R. 650 (S.D. N.Y. 1992).

33. Buyer has expended substantial due diligence in determining whether to make an offer for the Businesses. Any other prospective purchaser may chose to do less due diligence relying on the fact that Buyer has already determined its willingness to commit to acquire the Businesses. The Break-up fee is fair, reasonable and necessary to protect the Buyer and to attract the Buyer as a purchaser of the Businesses. Accordingly, the Debtors respectfully request that the Breakup fee provision of the Agreement be explicitly approved and authorized by the Court.

### The Competitive Bidding Procedures

34. "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting the sale." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 230

B.R. 840, 844 (B.A.P. 8th Cir. 1999); *see, e.g., In re Gould*, 977 F.2d 1038, 1042 (7th Cir. 1992) (bankruptcy court's bidding procedures reviewed for abuse of discretion).

35. The Debtors believe that the Bidding Procedures will effectuate these goals and that these procedures represent the best opportunity for the maximization of value for the estate and creditors. In this same vein, the Debtors believe that the Bidding Procedures adequately safeguard the interests of the Estate and its creditors in achieving a maximum return from the sale of the Business. Accordingly, the Debtors respectfully requests that the Bidding Procedures be approved and authorized.

### Section 363(F): Sale Free and Clear

36. Section 363(f) of the Bankruptcy Code governs "free and clear" sales of estate property, providing, in relevant part, as follows:

> The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (a) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37. Accordingly, under this provision, the Debtors may sell the Businesses free and clear of all liens, claims, interests, and encumbrances. To the best of the Debtors' knowledge, information, and belief, the only entities that assert security interests in or liens against the

{7236 MOT A0254776.DOC}                     15

Businesses are PSF, MESBIC, the Trustee-Lenders, 1st Source Bank and CNH Capital America LLC. The Debtors believe that the free-and-clear provisions of the Agreement now comport, or at the time of sale will comport, with section 363(f). In this respect, the Debtors believe that all creditors asserting valid interests in and against the Businesses either already have, or prior to the Sale Hearing will likely have, consented to (or otherwise not object to) the sale or that such creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest.

38. Further, the Debtors submit that any lien, claim, interest, or encumbrance asserted against the Business will be adequately protected by attachment to the Sale Proceeds. Accordingly, the Debtors respectfully request that the Court permit the transfer the Businesses to the Purchaser free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances attaching to the sale proceeds.

WHEREFORE, the Debtors respectfully request that the Court enter the Order in the form attached hereto and grant such other and further relief that it deems just and equitable.

Dated:  March 22, 2010                    Respectfully submitted,

                                          Perpetua, Inc.
                                          Perpetua Holdings of Illinois, Inc.
                                          Perpetua-Burr Oak Holdings of Illinois, L.L.C.

                                          By:   */s/Brian L. Shaw*
                                                  One of their attorneys

Robert M. Fishman (#3124316)
Brian L. Shaw (#6216834)
Kimberly Bacher (#6285677)
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654
(312) 541-0151  telephone
(312) 980-3888  facsimile

{7236 MOT A0254776.DOC}                    16