# Exhibit A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of this 15th day of March, 2010, by and among Perpetua Holdings of Illinois, Inc. d/b/a Cedar Park Funeral Home and Cemetery ("**Cedar Park**") and Perpetua-Burr Oak Holdings of Illinois, L.L.C. d/b/a Burr Oak Cemetery ("**Burr Oak**" and, together with Cedar Park, the "**Sellers**"), and **CEMECARE, LLC**, an Illinois Limited Liability Company ("**Purchaser**").

R E C I T A L S:

WHEREAS, Burr Oak owns and operates an active cemetery located at 4400 W. 127th Street, Alsip, Illinois (the "**Burr Oak Business**");

WHEREAS, Cedar Park owns and operates an active funeral home and cemetery located at 12540 S. Halsted, Calumet Park, Illinois (the "**Cedar Park Business**" and, together with the Burr Oak Business, the "**Businesses**");

WHEREAS, Pacesetter SBIC Fund, Inc. ("**PSF**") and MESBIC Ventures, Inc. ("**MESBIC**," along with PSF, the "**Lenders**") are lenders to and hold first liens on substantially all of the assets of the Cedar Park and the Burr Oak Cemeteries, including those used to operate the Businesses;

WHEREAS, this Agreement contemplates a transaction in which the Purchaser will acquire substantially all of the assets of the Businesses and assume certain liabilities of the Businesses, subject to the terms and conditions set forth in this Agreement;

WHEREAS, each of the Sellers filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") for relief in a bankruptcy case (collectively, the "**Bankruptcy Case**") filed under Chapter 11 of Title 11 of the United States Code 11 U.S.C. §§ 101-1330 (the "**Bankruptcy Code**") on September 14, 2009 (the "**Petition Date**").

NOW, THEREFORE, the parties agree as follows:

1. **Purchase of Assets.** Subject to the provisions of this Agreement and approval by the Bankruptcy Court, the Purchaser agrees to purchase, and the Sellers agree to sell, by bill of sale (unless by means of conveyance otherwise designated), all of Sellers' right, title and interest in and to all of the assets used in the operation of the Burr Oak and Cedar Park Businesses, including, but not limited to the following (collectively, the "**Sale Property**"), all of which shall be sold "**as is**" and "**where is,**" with no representations or warranties of fitness or condition from the Sellers:

    (a) Real estate including, but not limited to, the real property and improvements thereon commonly known as 4400 W. 127th Street, Alsip, Illinois the legal description of which is attached hereto and incorporated herein as Exhibit A (the "**Burr Oak Real Estate**") and the real property and improvements thereon commonly known as 12540 S. Halsted, Calumet Park, Illinois the legal description of which is attached hereto and incorporated herein as Exhibit B (the "**Cedar Park Real Estate**" and, together with the Burr Oak Real Estate, the "**Real Estate**") which real estate shall be conveyed by the documents

{7236 AGR A0255230.DOC 2}   1

set forth in subparagraph 5(b);

(b) Equipment, machinery, furniture, fixtures, tools and inventory as set forth on Exhibit 1;

(c) All current and pending estimates, open orders, customer contracts and customer contacts;

(d) All books and records relating to the Sellers to the extent the same are assignable including, but not limited to, files and databases, customer lists and sales records, supplier lists and purchase records, employee records and files, files and records relating to commissions or other compensation, (collectively, the "**Books and Records**"), but excluding business organizational documents, corporate minute book, corporate seal, stock record books, financial records, income tax returns, checkbooks and cancelled checks (collectively, the "**Excluded Books and Records**"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Books and Records from each Business are transferred to the Purchaser of such Business, and, to the extent that any Books or Records are applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Book or Record and any cost associated therewith shall be split amongst each Purchaser.

(e) All computer hardware (including all peripherals, accessories, attachments and documentation associated therewith) and software (and all source codes, object codes and documentation associated therewith) owned or licensed by the Sellers on the Petition Date (the "**Computer Hardware and Software**"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Computer Hardware and Software from each Business are transferred to the Purchaser of such Business, and, to the extent that any Computer Hardware or Software are applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Computer Hardware or Software and any cost associated therewith shall be split amongst each Purchaser.

(f) All intangible assets or intellectual property, if any, pertaining to the Sale Property, including without limitation, all artwork, trademarks, trade names, patents (current and expired), patent rights, service marks, service names, brand names, domain names, websites, URLs, royalties, symbols, logos, slogans, designs, copyrights, technical know-how, sales techniques, methods, procedures, and all applications and renewal rights for, and all other rights associated with, all of the foregoing; all claims and rights, and benefits arising therefrom, with or against all persons or entities relating to the Sale Property, the rights to use all telephone and fax numbers in use by the Sellers as of the Petition Date (collectively, the "**Telephone Numbers**"); and the goodwill associated with the Business; and any and all other proprietary information, intangible or intellectual property pertaining to the Sale Property and belonging to or registered in the name of either Seller (collectively, the "**Intangible Assets**"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Telephone Numbers and Intangible Assets from each Business are transferred to the Purchaser of such Business, and, to the extent that any Telephone Numbers or Intangible Assets are applicable to each Business and/or

inseparable, then each Purchaser shall be entitled to retain its own copy of such Telephone Numbers or Intangible Assets and any cost associated therewith shall be split amongst each Purchaser.

(g) All permits, licenses and approvals, to the extent they are assignable, including, without limitation, all environmental permits, if any (the "**Permits**");

(h) All employment agreements and rights thereunder which Purchaser designates for assignment and assumption in Exhibit C;

(i) All transferable prepaid insurance premiums (if insurance is assumed by the Purchaser), security deposits and vendor deposits arising in connection with the Business ("**Prepaid Expenses**");

(j) All claims and rights (and the benefits arising therefrom) with or against all persons whomsoever relating to the Sale Property;

(k) Environmental Reports and Surveys;

2. **Excluded Assets.**

(a) Notwithstanding anything to the contrary contained herein, Sale Property does not include any of the following: (a) cash and cash equivalents; (b) all tax refunds whenever arising; (c) all Excluded Books and Records, (d) any and all causes of action belonging to Cedar Park or Burr Oak; (e) any and all insurance claims; (f) any and all claims against former owners of the Burr Oak Real Estate or the Cedar Park Real Estate; and (g) any and all claims against former operators of any business known as the Burr Oak Cemetery or Cedar Park Cemetery (collectively, the "**Excluded Assets**").

(b) At or before the time of the Sellers' Sale, as defined in paragraph 4 below, Purchaser may, in its sole discretion, designate additional assets to be excluded from the Sale Property (such additional assets also referred to as "**Excluded Assets**").

3. **Payment of Purchase Price.**

(a) Concurrently with or prior to the execution and acceptance of this Agreement, the Purchaser shall, or shall have, deliver(ed) to the Sellers by wire transfer or cashiers' check, a sum equal to $60,000 (as defined below), which sum shall be held by the Sellers' counsel, Shaw Gussis Fishman Glantz Wolfson & Towbin LLC in its Client Trust Account, or such other account to which the parties hereto agree (together with all accrued interest, the "**Deposit**") pending the Closing, as defined in paragraph 5 below. In the event that the Purchaser is the successful bidder at the Sellers' Sale, then at the Closing, the Deposit will be delivered to the Sellers to be applied toward the "Purchase Price," as defined below, and the Purchaser shall pay to the Sellers the balance of the Purchase Price by wire transfer or cashiers' check in accordance with the Sellers' instructions. If the Purchaser is not the successful bidder at the Sellers' Sale, then subject to the provisions concerning the "Runner-Up Bid," as defined in paragraph 4 below, the Sellers shall immediately cause the Deposit to be returned to the Purchaser forthwith.

(b) The purchase price for the Sale Property shall be the sum of **SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100 ($675,000.00) DOLLARS** (the "**Purchase Price**"). The portion of the Purchase Price allocable to the Burr Oak Real Estate shall be **Twenty Five Thousand and No/100 Dollars ($25,000.00)** and the Cedar Park Real Estate shall be **Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00)** (reduced by proration as provided herein), and the balance of the Purchase Price shall be allocable to the other Sale Property.

4. **Method of Sale.**

(a) The Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter an order approving the bid procedures as discussed herein by April 2, 2010, and the Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter an order approving the sale by May 6, 2010, which date the Purchase may waive or extend in its reasonable discretion; provided the Purchaser's bid is the Accepted Bid (defined below).

(b) The parties hereto acknowledge that the Sellers shall advertise, to the public in such manner as the Sellers, in their sole discretion, deem(ed) appropriate, that the Sale Property is for sale as a single lot (i.e., both Businesses together) or in two distinct lots being sold as (i) the Cedar Park Business and (ii) the Burr Oak Business, and will be sold: (i) to the highest and best bidder(s) at a publicly advertised sale to be conducted by the Sellers at the offices of Shaw Gussis Fishman Glantz Wolfson & Towbin LLC, 321 N. Clark Street, Suite 800, Chicago, Illinois at 1:30 p.m. on April 26, 2010 (the "**Sellers' Sale**"). In connection therewith, the Sale Property and copies of this Agreement (with the identity of the Purchaser(s) redacted) shall be available for examination by other prospective purchasers or interested parties prior to the Sellers' Sale at such time or times as the Sellers, in their sole discretion, deem appropriate. In the event that this Agreement has not been terminated in accordance with paragraph 12 below by that time, the Purchaser's bid for the Sale Property as set forth in this Agreement shall be the opening bid for the Sale Property.

(c) The Sellers shall be authorized to receive and consider competing bids from third parties up to 1:30 p.m. (CDT) on April 23, 2010 to purchase the Sale Property provided that prior to the commencement of the Sellers' Sale, the Sellers have received from each of such third parties a written offer(s) to purchase the Sale Property, which: (i) individually or collectively satisfies the "Bid Protection" requirements set forth in paragraph 14(a) below; (ii) is on terms substantially similar to those set forth in this Agreement or on better terms (as determined by the Sellers in their sole and absolute discretion) for the Sale Property being purchased; (iii) is accompanied by a cashiers' check or wire transfer payable to the Sellers in an amount equal to 7.5% percent of the Purchase Price, which has been delivered to Sellers at least 24 hours prior to the commencement of the Sellers' Sale; and (iv) on such other terms as the Sellers may announce prior to or at the Sellers' Sale that are not in contravention of the terms described herein (each, a "**Qualifying Bid**").

(d) In the event that a Qualifying Bid(s) is received for the Sale Property, the Sellers will continue at the Sellers' Sale to seek higher bids for the Sale Property, in an auction format, in minimum increased increments of at least $10,000.00, if such bidding is for both Businesses or solely for the Cedar Park Business or, $5,000 if such bidding is solely for the Burr Oak Business until no further bids are made. In the event that there is no Qualifying Bid for the Sale Property, and in the event that this Agreement has not been terminated pursuant to paragraph 12 below, the Purchaser's bid as set forth in this Agreement shall be deemed accepted by the Sellers for

the sale of the Sale Property, subject (a) the Sellers right to withdraw its sale of the Burr Oak Business and (b) Purchaser's right to withdraw its offer to purchase the Burr Oak Business pursuant to section 6 of the Rider.

(e) In the event that the highest and best offer, as determined by the Sellers in their sole and absolute discretion, is submitted at the Sellers' Sale for the Sale Assets by a purchaser(s) other than the Purchaser, then the Sellers shall be entitled to accept such other bids, which offer(s) shall be deemed the **"Accepted Bid,"** and in the Sellers' sole and absolute discretion, announce the next highest or otherwise best bid to constitute a runner-up bid (**"Runner-Up Bid"**). In making their determination of what constitutes the Accepted Bid and the Runner-Up Bid, the Sellers will consider any factors they deem appropriate, in their sole and absolute discretion.

(f) In the event that the Accepted Bid is submitted by a party(ies) other than the Purchaser, and the Purchaser's bid herein (or as amended by the Purchaser at the Sellers' Sale in response to competitive bidding) is declared to be the Runner-Up Bid by the Sellers, the Purchaser hereby agrees to keep its offer to purchase the Sale Property open for a period not to exceed seven (7) calendar days from the date of the Sellers' Sale. The party submitting the Runner-Up Bid shall also be so required to keep its bid open. In the event that such Accepted Bid closes within said seven (7) days, then effective upon the closing, this Agreement shall be considered null and void and of no legal effect whatsoever and the Sellers shall pay the "Breakup Fee," as defined in paragraph 14 below, to the Purchaser, within three (3) business days after such closing, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(g) In the event that the Accepted Bid fails to close because of a breach or failure to perform on the part of such bidder, then the Sellers, in their sole and absolute discretion, may accept the Runner-Up Bid in writing within seven (7) calendar days after the date of the Sellers' Sale, in which case the party(ies) submitting the Runner-Up Bid, including the Purchaser if applicable, shall be required to consummate the transactions contemplated in the Runner-Up Bid within the thirty (30) calendar days following the Sellers' Sale. If the Purchaser is the holder of such Runner-Up Bid, then the Purchaser shall not be entitled to receive all or any portion of the Breakup Fee.

(h) If the Purchaser is not the Accepted Bid or the Runner-Up Bid, then upon the conclusion of the Sellers' Sale, this Agreement shall be considered null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee, to the Purchaser within three (3) business days after the conclusion of the Sellers' Sale, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.

5. **Closing.**

(a) Closing Date. Subject to the terms and conditions of this Agreement and approval by the Bankruptcy Court, and if the Purchaser submits the Accepted Bid, the closing of the transactions contemplated herein (the **"Closing"**) shall be held within seven (7) days from and after the conclusion of the Sellers' Sale at the offices of the Sellers' counsel or such other date and place as the Purchaser and the Sellers may agree, but in no event later than 5:00 p.m., May 7, 2010 (the **"Closing Date"**).

   (b) <u>Sellers' Deliveries at Closing</u>. At the Closing, the Sellers shall execute and deliver or cause to be executed and delivered to the Purchaser the following:

    (i) A final and non-appealable order from the Bankruptcy Court in a form substantially acceptable to Purchaser, providing and authorizing the Sellers' Sale of the Sale Property to Buyer under 11 U.S.C. § 363 free and clear of all liens, claims and encumbrances.

    (ii) A Sellers' Bill of Sale for the Sale Property in form acceptable to Purchaser, transferring all of Sellers' right, title and interest therein, free and clear of any and all liens, claims or encumbrances;

    (iii) UCC-3 termination statements as to all of the Sale Property sold to the Purchaser in recordable form and, if necessary, executed by the appropriate officer(s) of the Sellers and the Lenders;

    (iv) A release and satisfactory mortgage in recordable form releasing the mortgage interest of the Lenders in the Real Property;

    (v) A Quit Claim Deed from the owner of the Real Estate conveying all of such owner's right, title and interest in the Real Estate to Purchaser's designee;

    (vi) At Sellers' expense, an Owner's Policy of Title Insurance issued by Chicago Title & Trust Company with extended coverage in the amount of the Purchase Price for the Real Estate showing fee simple title to the Real Estate vested in Purchaser, subject only to non-delinquent taxes and assessments and Permitted Exceptions with the following endorsements as applicable:

     (a) contiguity;

     (b) tax parcel;

     (c) zoning (including parking);

     (d) survey; and

     (e) access.

    (vii) A real estate transfer tax declaration in customary form;

    (viii) Uniform Commercial Code financing statement and special searches of the records of the Secretary of the State of Illinois and the Recorder of Deeds of Cook County, satisfactory to Purchaser;

    (ix) A certification of non-foreign status in the form prescribed by Section 1445(b)(2) of the Internal Revenue Code;

(x) Sufficient information, to the extent reasonably available to the Sellers, to enable the party responsible for closing the transaction contemplated by this Agreement to comply with the provisions of Section 6045(e) of the Internal Revenue Code and any state revenue or tax laws relating to the transaction contemplated by this Agreement;

(xi) Payment of all transfer taxes with respect to the sale of the Real Property; and

(xii) Such other instruments and documents as the Purchaser shall reasonably request to consummate the transactions contemplated in this Agreement.

(c) <u>Purchaser's Deliveries at Closing</u>. At the Closing, the Purchaser shall execute and deliver or cause to be executed and delivered to the Sellers the following:

(i) The Purchase Price, less the Deposit and prorations, by cashiers' check or wire transfer;

(ii) Proof of Purchaser's receipt of all required licenses and certifications required to own and operate a cemetery and funeral home in the state of Illinois, Cook County, Illinois and Alsip and Calumet Park, Illinois; and

(iii) Such other instruments and documents as the Sellers shall reasonably request to consummate the transactions contemplated in this Agreement.

6. **<u>Delivery and Condition of the Sale Property</u>.**

(a) Immediately upon completion of the Closing, the Sellers shall be deemed to have fully and completely turned over to the Purchaser the possession, custody and control of the Sale Property and all keys to the Real Estate. In connection therewith, the Sellers shall be deemed to have vacated the Real Estate and the Sale Property concurrently upon the Closing. The Purchaser agrees that neither the Sellers nor the Lenders are assuming and accordingly, shall not be liable or responsible for any or all liabilities or obligations of any kind or nature whatsoever arising out of, under, or related to the Real Estate and/or the storage, use, removal, sale, transfer, conveyance or other disposition of the Sale Property from and after the Closing.

(b) The Purchaser agrees that it is purchasing and shall take possession of the Sale Property in their **AS IS, WHERE IS** condition and acknowledges that it has previously been given the opportunity to and has conducted such investigations and inspections of the Sale Property as the Purchaser has deemed necessary or appropriate for the purposes of this Agreement. Upon the execution of this Agreement by all parties hereto, the Purchaser agrees that it shall be deemed to have completed all of its due diligence with respect to the transactions contemplated herein.

(c) **Except as expressly provided for herein, the Purchaser acknowledges and agrees that neither the Sellers, the Lenders, or their advisors have made, and hereby do not make, any express or implied representations, statements, warranties, or conditions of any kind or nature whatsoever concerning the Sale Property, including without limitation of the generality of the foregoing, the ownership, condition, working order, sufficiency, quantity**

and/or quality of any or all of the Sale Property; any warranty of title, possession, quiet enjoyment or the like; the assignability of the leases or any of them, any of the Real Estate's environmental status and conditions, roof, heating, central cooling, ventilating, lighting, plumbing and electrical fixtures and systems, basement flooding, leaks, seepage, insect infestation; the ability to use the Telephone Numbers; the Sellers, their customers, creditors, employees, assets, liabilities, business, operations, profitability or lack thereof, projections, estimates, budgets, or any other matters of any kind or nature whatsoever arising out of, under or related to the Business and/or the matters leading up to this Agreement; the completeness or accuracy of the Sellers' past or present financial statements, Books and Records and other financial information; or any and all implied warranties of merchantability or fitness for a particular purpose, except that the Sale Property is being sold free and clear of all liens, claims and encumbrances of the Sellers and the Lenders.

(d) The Purchaser agrees that it shall be solely responsible and liable for any loss, cost, damages, expenses or liabilities of any kind or nature whatsoever arising out of, under or related to the Purchaser's storage, use, removal, sale, transfer, conveyance or other disposition of the Sale Property from and after the Closing.

7. **Due Diligence and Conditions Precedent to Obligations of Parties to Close.**

(a) The obligations of the Sellers to proceed with the Closing under this Agreement and to consummate the transactions contemplated herein are subject to the outcome of the Sellers' Sale as set forth above, and the fulfillment of the condition that all of the Purchaser's representations, warranties and covenants contained herein shall be true and correct as of the Closing, with the same force and effect as though such representations, warranties and covenants had been made on, as of and with reference to the Closing; provided, however, the Sellers, in their sole and absolute discretion, may waive the failure to occur of any of the foregoing conditions precedent to their obligations to proceed with a Closing under this Agreement; and

(b) The obligations of the Purchaser to proceed with the Closing under this Agreement and to consummate the transactions contemplated herein are subject to the following: (i) the outcome of the Sellers' Sale as set forth above and the fulfillment of the condition that Sellers shall have complied with all terms of this Agreement and all of the Sellers' representations, warranties and covenants contained herein shall be true and correct as of the Closing, with the same force and effect as though such representations, warranties and covenants had been made on, as of and with reference to the Closing; (ii) prior to the Sellers' Sale, that there is no occurrence or litigation pending that attempts to stay or otherwise prohibit the Sellers' rights to sell their interests in the Sale Property to the Purchaser; (iii) the Sellers shall not have sold, leased, transferred, conveyed, assigned or disposed of in any manner whatsoever, any of the Sale Property, except in the ordinary course of business; and (iv) the Sellers shall have paid, or set aside, sums sufficient to pay through the Closing, for those employees who will be hired by the Purchaser, all regular wages, salaries and covered applicable health insurance premiums due to/for such employees; provided, that the Purchaser, in its sole and absolute discretion, may waive the failure to occur of any of the foregoing conditions precedent to its obligations to proceed with a Closing under this Agreement.

8. **Pre-Closing Covenants**. Between the date hereof and the Closing, the parties hereto each hereby covenant and agree, as the case may be, as follows:

(a) The Sellers shall not sell, lease, transfer, convey, assign or dispose of in any manner whatsoever, any of the Sale Property, except in the ordinary course of the Business;

(b) The Sellers agree to use all reasonable diligence to operate the Business in the ordinary course of business as the same has been operated since the Petition Date through the Closing, except as otherwise disclosed in writing to Purchaser;

(c) The Sellers agree to use all reasonable diligence to maintain and preserve the Sale Property prior to the Closing in their present state and condition in all material respects, subject only to ordinary wear and tear and the ordinary course of Business;

(d) Each party agrees not to knowingly take, or fail to take, any action which by reason of taking or such failure to take would make any representations or warranties of each party herein materially untrue, inaccurate or otherwise misleading; and

(e) Each party agrees to take all corporate or organizational actions, as the case may be, and any other action reasonably necessary to consummate and carry out the transactions contemplated herein.

9. **Liabilities Generally Not Assumed**.

(a) From and after the Closing, the Purchaser is not assuming, nor shall it in any way be liable or responsible for, any liabilities, obligations or debts of the Sellers relating to the Business, the Sale Property or otherwise, or the operation of the Business prior to Closing, whenever arising and whether known or unknown, primary or secondary, direct or indirect, absolute or contingent, contractual, tortious or otherwise, other than those set forth in paragraph 9(b) below.

(b) Notwithstanding the foregoing paragraph 9(a), Purchaser shall assume the Seller's obligations under its "Pre-Need" contracts with customers and for deeded lots, as set forth on Schedules 9(b)(1) and (2) hereto, respectively.

10. **Sellers' Representations and Warranties.** The Sellers, in order to induce the Purchaser to enter into this Agreement, hereby covenant, represent and warrant to the Purchaser with the intent and understanding that it is expressly relying thereon as a material inducement to enter into this Agreement as follows:

(a) The Sellers have full rights, powers and authority to execute this Agreement and consummate the transactions contemplated herein;

(b) The Sellers have provided and shall provide adequate published notice of the Sellers' Sale to satisfy all fair notice requirements in law and equity;

(d) The representative executing and delivering this Agreement on behalf of the Sellers has full right, power and authority and is duly authorized and empowered to enter into, execute, deliver and perform under this Agreement, and upon execution and delivery, this Agreement will be a valid, binding, subsisting and enforceable obligation of the Sellers and the Lenders;

(e) The Sellers have not heretofore, sold, transferred, pledged, conveyed or otherwise disposed of their rights, title and interest in and to the Sale Property;

(f) The Sellers have made reasonable efforts to comply with all necessary provisions of Federal law and Illinois law in order to consummate the transactions contemplated in this Agreement; and

(g) The Seller will have obtained a final and non-appealable order from the Bankruptcy Court authorizing the sale of the Sale Property.

11. **Purchaser's Representations and Warranties.** The Purchaser, in order to induce the Sellers to enter into this Agreement, hereby covenants, represents and warrants to them with the intent and understanding that they are expressly relying thereon as a material inducement to enter into this Agreement as follows:

(a) The Purchaser is a **limited liability company** duly authorized, existing and in good standing under the laws of the state of Illinois and has full rights, powers, and authority to execute this Agreement and consummate the transactions contemplated herein and the Purchaser's Sellers, if any, at Closing, will be an entity duly authorized validly existing and in good standing under the laws of its state of organization and will have the full rights, power and authority to consummate the transactions contemplated hereby;

(b) This Agreement: (i) has been duly authorized by all necessary corporate actions on the part of the Purchaser and that such corporate actions have not been modified or rescinded; (ii) does not and will not violate the provisions of the Purchaser's **Operating Agreement** or any applicable law, regulation, judgment, or order, or of any agreement, instrument or obligation by which the Purchaser or its properties are bound and if this Agreement is assigned by Purchaser prior to Closing, this Agreement will be duly authorized by all necessary company action on the part of such Sellers and that such company action will not violate the provisions of the Sellers' formation documents and bylaws or operating agreement, as the case may be, or any applicable law, regulation, judgment, or order, or of any agreement, instrument or obligation by which such Sellers or its properties are bound;

(c) Promptly upon the execution of this Agreement, Purchaser will take any acts necessary for it to obtain all licenses and certifications required to own and operate a cemetery and funeral home in the state of Illinois, Cook County, Illinois and Calumet Park, Illinois, and use its best efforts to obtain the same; and

(d) The representative executing and delivering this Agreement on behalf of the Purchaser is duly authorized and empowered to act.

12. **Termination and Remedies**. This Agreement and the transactions contemplated herein may be terminated prior to Closing pursuant to any of the following:

(a) By the mutual written consent of the Sellers and the Purchaser, in which case, this Agreement shall be null and void and of no legal effect whatsoever, and each party hereto shall

suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement;

(b) Upon the Sellers' acceptance of an Accepted Bid by a party other than the Purchaser which Accepted Bid thereafter closes, or if the Purchaser is not the Accepted Bid or the Runner-Up Bid, whether or not the Sellers close on either bid, this Agreement shall be null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee to the Purchaser, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement; or

(c) If the Purchaser is not in default hereunder and the Sellers fail to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of the Purchaser, then the Purchaser shall have the right to: (1) terminate this Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee to the Purchaser within three (3) business days after termination hereof; or (2) waive or agree to modify the occurrences causing the Sellers' inability to consummate the transactions contemplated herein, after which the Purchaser shall be required to consummate the transactions contemplated herein.

13. **Brokers**.  The Purchaser represents and warrants that it has not engaged, consented to, or authorized any other broker, investment banker, or other third party to act on its behalf, directly or indirectly, as a broker or finder in connection with the transactions contemplated by this Agreement, and that no such other third party is entitled to any fee or compensation in connection with this Agreement or the transactions contemplated hereby by reason of any action of it. The Purchaser shall indemnify, defend and hold harmless the Sellers from any and all claims of any broker, investment banker, or other broker or finder, other than Broker, arising by, through or under it in connection with this transaction.

14. **Bid Protection and Breakup Fee**.

(a) Subject to approval by the Bankruptcy Court, the Purchaser shall receive bid protection in an amount equal to (i) $35,000.00 over the Purchase Price with regard to bids for either (i) both Businesses, together, or for Cedar Park Business, alone and (ii) $5,000 for bids on Burr Oak business, alone. The Sellers shall not accept at the Sellers' Sale any Qualifying Bid(s) unless such competing offer(s), either individually or collectively, provide the Sellers with consideration at the Closing in excess of $35,000.00 over the Purchase Price.

(b) Subject to paragraphs 4 and 12 above, if this Agreement is terminated due to the Sellers' acceptance of a higher and better Qualifying Bid submitted at the Sellers' Sale for either both the Businesses, together, or the Cedar Park Business, alone, and such transaction closes, or in such other cases as described herein for which the Purchaser is entitled to the Breakup Fee, then the Sellers shall cause a payment to be made to the Purchaser in an amount equal to $25,000.00 (the **"Breakup Fee"**) within the time period specified therein, that shall be deemed to satisfy in full any and all losses, costs, expenses, or damages of Purchaser arising out of, under or related to this Agreement. Purchaser will not be entitled to a break up fee solely on account of the sale of the Burr Oak Business to another entity.

15. **Prorations**. The Sellers shall be responsible for, and pay, all expenses required to be

{7236 AGR A0255230.DOC 2}        11

paid hereunder and all prorations with respect to the Business and the Sale Property accruing up to 11:59 p.m. on the day of Closing, except as otherwise expressly provided herein. All prorations shall be made to the extent reasonably practicable on the basis of actual days for a 365-day year and with respect to the Real Property, real estate taxes shall be prorated based upon the most recent real estate tax bill and the following additional charges shall be prorated: water, utilities, insurance (if being assumed by Purchaser) and contracts related to the Real Estate being assured by Purchaser. If the exact amount of prorations cannot be determined at the Closing, the same shall be adjusted at the Closing based on the parties' good faith estimate and the Purchase Price shall be adjusted accordingly and the Sellers shall retain adequate resources for the reproration of such items within ninety (90) days following the Closing Date.

**16. Survival.** The representations, warranties and covenants contained herein shall survive the execution and delivery of this Agreement and Closing until barred by applicable statute of limitations.

**17. Post-Closing Obligations.**

(a) The Purchaser agrees to make the Books and Records, wherever located, available for inspection by the Sellers or by their duly authorized representatives, at no charge, for reasonable business purposes at all reasonable times during normal business hours, for a three (3) year period after the Closing, with respect to the operation of the Business occurring prior to and relating to the Closing, and the historical financial condition, assets, liabilities, operations, and cash flows of the Sellers prior to the Closing. As used in this section, the right of inspection includes the right to make extracts or copies at the requesting party's sole cost. Any party or representative of such party shall give the Purchaser at least two (2) business days notice prior to such inspection. The representatives of the Sellers inspecting the Books and Records shall be reasonably satisfactory to the Purchaser, and the Purchaser can require such confidentiality agreements as are reasonable under the circumstances.

**(b)** In the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Sale Property from each Business is transferred to the Purchaser of such Business, and, to the extent that any Sale Property is applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Sale Property and any cost associated therewith shall be split amongst each Purchaser.

(b) The Sellers agree to make the Excluded Books and Records, wherever located, available for inspection by the Purchaser and its duly authorized representatives, at no charge, for reasonable business purposes at all reasonable times during normal business hours, for a one (1) year period after the Closing. As used in this section, the right of inspection includes the right to make extracts or copies at the requesting party's sole cost. The Purchaser or representative of the Purchaser shall give the Sellers at least two (2) business days notice prior to such inspection. The representatives of the Purchaser inspecting the Excluded Books and Records shall be reasonably satisfactory to the Sellers, and the Sellers can require such confidentiality agreements as are reasonable under the circumstances.

(c) For a period of one hundred eighty (180) days after the Closing, the Purchaser

shall afford the Sellers or their duly authorized representatives reasonable access to such Facilities still occupied by the Purchaser, at no cost to the Sellers, to assist the Sellers in completing the administration of the Bankruptcy Case.

18. **Amendment and Modification**. This Agreement may be amended, modified or supplemented only by written agreement of the parties hereto.

19. **Severability.** Any provision of this Agreement that shall be prohibited or unenforceable shall be deemed ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

20. **Entire Agreement**. This Agreement, including those documents identified herein or appended hereto as Exhibits, constitutes the entire contract between the parties relating to the subject matter hereof and is the final and complete expression of their intent. No prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing, have been made by the parties, or any of them, in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated into this Agreement; it being the intention of the parties hereto that in the event of any subsequent litigation, controversy, or dispute concerning the terms and provisions of this Agreement, no party shall be permitted to offer to introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing.

21. **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Illinois.

22. **Counterparts.** This Agreement may be executed in one or more counterparts, all of which taken together constitute one and the same instruments. A signed counterpart is as binding as an original. A facsimile signature shall be treated as an original signature.

23. **No Contract until Execution**. This Agreement shall become valid and binding only after it is executed and delivered by the parties. Until execution hereof, it is the intention of the parties that (a) no agreement, contract, offer of agreement or proposal arises and (b) no estoppel is created by the submission of any draft hereof or any other conduct of the parties.

24. **Expenses.** Except as otherwise expressly set forth herein, each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including, without limitation, attorneys, accountants, and other professional fees and expenses.

25. **Non-Waiver**. The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in

writing and signed by an authorized representative of the waiving party.

    **26.** **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

    **27.** **Future Deliveries**. The parties shall execute such further documents, and take such other actions, as may be reasonably necessary to transfer and convey the Sale Property to the Purchaser on the terms contained herein and to otherwise comply with the terms and conditions of this Agreement and consummate the transactions herein provided.

    **28.** **Time**. Time is of the essence of this Agreement.

    **29.** **Notices**. All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States express mail. Notices shall be deemed given on the first business day following receipt; provided, however, that a notice delivered by facsimile shall only be effective if such notice is also delivered by hand. All notices shall be addressed as follows (or to such other address as any party shall have advised the others in writing):

If to the Sellers addressed to:

    Brian L. Shaw
    Shaw Gussis Fishman Glantz
      Wolfson & Towbin LLC
    321 North Clark Street, Suite 800
    Chicago, Illinois 60610
    Fax No.: (312) 980-3888

With copies to:

    Mr. Melvin Bryant

If to The Purchaser addressed to:

CEMECARE, LLC
4161 West 166th Street, Suite A
Oak Park, Illinois 60452

With copies to:

Philip L. Mandell
Pitler and Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois 60603

{7236 AGR A0255230.DOC 2}    14

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this paragraph.

**30. Assignability.** This Agreement shall not be assignable by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed, except that the Purchaser shall have the right in its sole discretion to assign its rights and obligations under the Agreement to any affiliated entity, in which case that entity shall be thereafter deemed to be the "Purchaser" for purposes of this Agreement and all documents executed in connection herewith.

**31. Headings**. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

**32. Construction of Terms.** This Agreement has been drafted jointly by the parties in full consultation with their respective attorneys, and no ambiguity in this Agreement shall be interpreted or construed against any of the parties as the drafter hereof.

**34. Incorporation by Reference**. The recitals hereto and all schedules and exhibits attached hereto shall be deemed an integral part of this Agreement and shall be incorporated herein by reference.

**SEE RIDER ATTACHED HERETO AND MADE A PART HEREOF**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first above written.

**SELLERS:**

**PERPETUA HOLDINGS OF ILLINOIS, INC.**

By:_____
Its:_____

**PERPETUA-BURR OAK HOLDINGS OF ILLINOIS, L.L.C.**

By:_____
Its:_____

**PURCHASER:**

**CEMECARE, LLC,**
**an Illinois Limited Liability Company**


By:_____
Its:_____

THIS RIDER IS ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSET PURCHASE AGREEMENT DATED MARCH 15, 2010 BY AND AMONG PERPETUA HOLDINGS OF ILLINOIS, INC., d/b/a CEDAR PARK FUNERAL HOME AND CEMETERY AND PERPETUA-BURR OAK HOLDINSG OF ILLINOIS, L.L.C., d/b/a BURR OAK CEMETERY TOGETHER WITH CEDAR PARK (SELLER), AND CEMECARE, LLC, AN ILLINOIS LIMITED LIABILITY COMPANY (PURCHASER)

R-1. In the event of a conflict between (a) the terms and conditions set forth in the Asset Purchase Agreement and this Rider, in all instances this Rider shall supersede and be in full force and effect or (b) the terms and conditions of this Rider or the Asset Purchase Agreement, on the one hand, and any Order of the Bankruptcy Court regarding the sale under the Asset Purchase, the Order shall prevail.

R-2. Purchaser shall have until March 30, 2010 ("Due Diligence Period") to review the books and records maintained by Seller in connection with the operation of the Cemetery and business and to confirm that the amount of the trust funds and perpetual care funds are maintained and are transferable to Purchaser.

R-3. The consummation of his transaction is further contingent upon the entry of an order of the Bankruptcy Court selling the Sale assets free and clear of any liens, claim and encumbrances, including any claims and expenses arising form the prior operation of the Businesses, unless expressly assumed under the Asset Purchase Agreement, under section 363 of the Bankruptcy Code in a form reasonably acceptable to Purchaser.

R-4. Purchaser shall confirm compliance with all laws with respect to employment, employment practices, terms and conditions and that Seller has fulfilled its obligations to the extent applicable under the minimum requirements of ERISA and all applicable Income Tax provisions and that there are no outstanding deferred compensations, severance, pension and profit sharing, retirement plans and bonuses due and owing.

R-5. Purchaser will use its best efforts to obtain all licenses within the required time limit, but in the event Purchaser is unable to do so, the closing of the transaction will be extended until such licenses are procured.

R-6. Purchaser shall have the right to rescind its proposal to acquire Burr Oak up through and until April __, 2010 (__ days prior to the Auction Date). At that time, at Purchaser's option, the amount of money allocated to the Purchase Price of Burr Oak shall be added to the Purchase Price of Cedar.

Case 09-34022 Doc 439-1 Filed 03/22/10 Entered 03/22/10 15:31:47 Desc Exhibit A Page 19 of 19

R-7. Seller has made Purchaser aware of certain "Pre-Need" Contracts with customers, including but not limited to an Executory Contract to build a mausoleum on the Cedar Park real estate. Purchaser shall have until the conclusion of the Due Diligence Period to review the various "Pre-Need" Contracts with customers for deeded lots, including the agreement to build the mausoleum and to terminate and rescind this Agreement and obtain a refund of all of its earnest money.

{7236 RID A0255318.DOC 2}