# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| PERPETUA-BURR OAK HOLDINGS OF | ) | Case No. 09-34022 |
| ILLINOIS, L.L.C., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Pamela S. Hollis |

## ORDER (I) AUTHORIZING THE SALE OF OPERATING ASSETS OF CEDAR PARK CEMTERY AND BURR OAK CEMETERY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) GRANTING RELATED RELIEF

Upon the motion of Perpetua Holdings of Illinois, Inc. d/b/a Cedar Park Cemetery ("Cedar Park") and Perpetua-Burr Oak Holdings of Illinois, LLC d/b/a Burr Oak Cemetery ("Burr Oak," collectively with Cedar Park, the "Debtors") for the entry of an order approving (a) sale of the Cedar Park Business (as defined below) and Burr Oak Business (as defined below), (b) terms of the Agreement, (c) Terms and Bidding Procedures, Break Up Fee and Auction Notice and (d) related relief (the "Motion"); and the Court having granted a portion of the relief requested in the Motion by entry of an order (the "Procedures Order") at a hearing held on April 1, 2010 (the "Sale Authorization Hearing"); and the Court having heard the statements of counsel and the evidence presented in support of the balance of the relief requested in the Motion at a hearing before the Court on April 27, 2010 (the "Sale Hearing"); and upon the full and complete record of these Chapter 11 cases; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion, at the Sale Authorization Hearing, and at the Sale Hearing establish just cause for the relief granted herein; and it further appearing that the relief requested in the Motion is in the best interests of the Debtor(s), its (their) creditors, and all other parties in interest in these Chapter 11 cases; therefore,

THE COURT HEREBY FINDS AND DETERMINES THAT:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    The Court has jurisdiction to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    The statutory predicates for the relief sought in the Motion are sections 105(a) and 363 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

E.    Notice of the Motion has been published in accordance with the Procedures Order, and notice of the Motion has also been served upon:  (i) counsel to the Debtors' pre and post petition secured lenders; (ii) counsel to the Cook County Sheriff, and Illinois Attorney General and Comptroller; (iii) counsel to the United States Trustee; (iv) counsel for the Official Committee of Unsecured Creditors; (v) counsel to all parties having filed appearances in the Debtors' bankruptcy cases on or before April 1, 2010 and (vi) all other known creditors of the Debtors.

F.    As evidenced by the affidavits of service filed with the Court and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the sale of all of the operating assets and real estate of Cedar Park (the "Cedar Park Business") and all of the operating assets and real estate of Burr Oak (the

"Burr Oak Business," collectively with the Cedar Park Business, the "Businesses") pursuant to

that certain Asset Purchase Agreement dated as of March 15, 2010, as modified by the Burr Oak

Modification, as defined below (the "Agreement") between the Debtor and Cemecare, LLC has

been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and

Bankruptcy Rules 2002(a), 6004(a) and 6006(c), (ii) such notice was good and sufficient and

appropriate under the circumstances of the Debtors' cases, and reasonably calculated to reach

and apprise all holders of Claims and Interests (as hereafter defined) about the Sale and (iii) no

other or further notice of the Motion, the Sale Hearing and/or the Sale shall be required.

G.     A reasonable opportunity to object or be heard with respect to the Motion and the

relief requested therein has been afforded to all interested persons and entities in these cases.

H.     As demonstrated by: (i) the testimony and other evidence proffered or adduced at

the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing,

the Debtors have marketed the Business pursuant to the Agreement and conducted the Sale

Process (as hereafter defined) in a non-collusive, fair and good faith manner that was in

compliance with the Procedures Order.   A reasonable opportunity has been given to any

interested party to make a higher and better offer for the Businesses.

I.     The Debtors diligently and in good faith marketed the Businesses to obtain the

highest and best offer for the Businesses.  On April 26, 2010, the Debtors conducted the Auction

pursuant to the Procedure Order, subject to the modification of the terms of the Agreement as it

pertains to Burr Oak, which modification has been stated on the record in open Court (the "Burr

Oak Modifcation"), and at the conclusion of the Auction, it was determined that Cemecare, LLC

("Buyer") was the Winning Bidder for the Businesses.

J.    The terms and conditions set forth in the Agreement, subject to the Burr Oak Modification, and the Sale to the Buyer pursuant thereto, each are fair and reasonable and the Purchase Price (as defined in the Agreement) payable to the Debtor(s) pursuant to the Agreement constitutes the highest and best offer obtainable for the Businesses.

K.    The Debtor(s) (i) have (has) full corporate or other power to execute, deliver and perform its obligations under the Agreement and all other documents contemplated thereby or entered into in connection therewith, and the sale of the Businesses by the Debtor(s) has been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agreement, and such other documents contemplated thereby or entered into in connection therewith, and (iii) has taken all action necessary to authorize and approve the Agreement and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into in connection therewith.   No third-party consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtor(s) to consummate such transactions.

L.    Approval of the Debtors' (Debtor's) entry into the Agreement and the consummation of the Sale at this time are in the best interests of the Debtor(s), its their creditors, its (their) estates, and other parties in interest.

M.    The Debtor(s) have (has) demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization in that, among other things, the Sale enables the Debtor(s) to yield the highest value for the Businesses for the Debtors' creditors.

N.      The Agreement and the Sale were negotiated, proposed and entered into by the Debtor(s) and the Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor(s) nor the Buyer has engaged in any conduct that would cause or permit either the Agreement or any other related agreement to be avoided under section 363(n) of the Bankruptcy Code.

O.      The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.   In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale at any time after entry of this Order, notwithstanding the provisions of Bankruptcy Rule 6004(h).

P.      The Buyer is not an "insider" of the Debtors, as that term is defined under section 101 of the Bankruptcy Code.   The consideration provided by the Buyer pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Businesses being purchased by such Buyer, (iii) will provide a greater recovery to the Debtors' (Debtor's) estate(s), than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

Q.      The sale of the Businesses to Buyer will be a legal, valid, and effective transfer of the Businesses and, except for the liabilities expressly assumed by Buyer pursuant to the Agreement (the "Assumed Liabilities"), will vest Buyer with all right, title, and interest of the Debtor(s) to the Businesses free and clear of claims against and interests in the Debtor(s) and any claims, liens, or encumbrances against the Businesses (collectively the "Claims and Interests").

R.    Buyer would not have entered into the Agreement and Buyer would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor(s), their (its) estates, and their (its) creditors, if the sale of the Businesses to Buyer were not, except for the Assumed Liabilities, free and clear of all Claims and Interests of any kind or nature whatsoever, or if Buyer would, or in the future could, be liable for any of the Claims and Interests.

S.    The Debtor(s) may sell the Businesses free and clear of all Claims and Interests of any kind or nature whatsoever, because in each case, one or more of the standards set forth in section 363(f)(1) through (5) of the Bankruptcy Code has been satisfied.  Those holders of Claims and Interests who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims and Interests who did object fall within one or more of the other subsections of 363(f) of the Bankruptcy Code and are adequately protected by having their Claims and Interests that are secured by liens, security interests and similar encumbrances, if any, attach to the net proceeds of the Sale ultimately attributable to the property against or in which they assert such Claim or Interest, with the same validity, priority and effect and to the same extent that existed immediately prior to the consummation of the Sale and in all cases subject to any and all rights, claims and defenses that the Debtor(s) may have with respect thereto.

T.    The consideration provided by the Buyer pursuant to the Agreement is fair and adequate, represents consideration deemed valuable in law and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and other applicable law.  The Agreement has not been entered into with the intent to hinder, delay or defraud any of the

Debtors' (Debtor's) creditors or other parties in interest. This Order constitutes a final and

appealable order within the meaning of 28 U.S.C. §158(a).

NOW THEREFORE, THE COURT HEREBY ORDERS, ADJUDGES, AND DECREES

AS FOLLOWS:

**General Provisions**

1.      The Motion, to the extent not already granted by the Procedures Order, is granted

in all respects, as further described herein.

2.      The pending objections of the Committee (Dkt. No. 453) and Catherine Rogers

(Dkt. No. 455) to the Motion have been made moot or withdrawn.

3.      All other objections to the Motion or the relief requested therein that have not

been withdrawn, waived, or settled, and all reservations of rights included in such Objections,

except as explicitly preserved on the record of the Sale Hearing or in this Order, are overruled on

the merits.

**Approval of the Agreement**

4.      The Agreement, and all of the documents, agreements and all transactions

contemplated thereby or entered into in connection therewith be, and hereby are, approved in all

respects. A true and correct copy of the Agreement is attached hereto as Exhibit A.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor(s) are (is)

authorized and empowered to perform their obligations under and comply with the terms of the

Agreement and all other documents and agreements contemplated thereby or entered into in

connection therewith, and to consummate the Sale, pursuant to and in accordance with the terms

and conditions of the Agreement and such documents and agreements.

6.      The Debtor(s) are (is) authorized and empowered to execute and deliver, and is

(are) empowered to perform under, consummate and implement, the Agreement and all other

documents and agreements contemplated thereby or entered into in connection therewith, together with all additional instruments and documents that the Debtor(s) or the Buyer deem necessary or appropriate to implement the Agreement and to effectuate the Sale, and to take all further actions as may be reasonably necessary or desirable for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to its possession, the Businesses being sold to Buyer in the Sale, or as may be necessary or appropriate to the performance of the obligations contemplated by the Agreement.

7.      This Order and the Agreement shall be binding in all respects upon all creditors of and holders of equity interests in the Debtor(s) (whether known or unknown), any holders of Claims and Interests, all applicable successors and assigns of Buyer, the Debtor(s) and any subsequent trustees appointed in the Debtors' (Debtor's) Chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any Chapter 11 plan confirmed in this Chapter 11 case or the confirmation order confirming any such Chapter 11 plan shall conflict with or derogate from the provisions of the Agreement and the other agreements and documents entered into in connection therewith and no such plan or confirmation order shall discharge the obligations of the Debtor(s) under such agreements and documents.

8.      Except for the applicable Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the assets comprising the Businesses shall be transferred to Buyer and upon the Closing shall be, free and clear of all Claims and Interests of any kind or nature whatsoever (including, but not limited to, those described in paragraph Q of this Order), and all such Claims and Interests that are secured by liens, security interests and similar encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the Sale in the

order of their priority, with the same validity, force, and effect which they now have as against the Businesses, subject to any rights, claims or defenses the Debtor(s) may possess with respect thereto.

9.      The sale of the Businesses to Buyer pursuant to the Businesses constitute the legal, valid, and effective transfer of the Businesses, and shall vest the Buyer with all right, title, and interest of the Debtor(s) in and to the Businesses being purchased by the Buyer free and clear of all Claims or Interests of any kind or nature whatsoever other than the applicable Assumed Liabilities (which are set forth in Section 9(b) of the Agreement and the Schedules 9(b)(1) and (2) thereto, as well as in paragraph R7 of the Rider to the Agreement).  Schedules 9(b)(1) and (2) are attached to this Order as Exhibit B.

10.     Under the Agreement, the Debtors have explicitly retained any and all claims that the Debtors might assert against any third party, including, but not limited to, claims against prior owners, claims against current and former employees, directors, managers, investors and shareholders, all derivative claims which are the possession of the Debtor pursuant to the Bankruptcy Code, and all claims that arise under Article 5 of the Bankruptcy Code and/or similar state law provisions.

11.     The Assumed Liabilities include all valid pre-need contracts for burial plots, funerary goods and funerary services entered into between the Debtor in its capacity as owner of Businesses and individuals.  To the extent that an individual can demonstrate that he or she holds a valid and enforceable contract with the Debtor for pre-need burial plot(s), funerary goods or services, but said contract is not enumerated in Schedules 9(b)(1) and (2), the Buyer has agreed to nonetheless assume said contract and use its best efforts to honor it in a commercially reasonable fashion.  To the extent that an individual's pre-need contract for a particular burial

plot cannot be honored, the Buyer has agreed to offer an equivalent burial plot at the relevant

Business to that individual or his/her family members.  The Bankruptcy Court shall retain

jurisdiction to hear and determine all matters arising from the assumption of the Assumed

Liabilities.

12.     If any person that has filed financing statements, mortgages, mechanic's liens, lis

pendens, or other documents or agreements evidencing Claims or Interests in the Debtor(s) or the

Businesses shall not have delivered to the Debtor(s) prior to the Closing, in proper form for filing

and executed by the appropriate parties, termination statements, instruments of satisfaction,

releases of all Claims or Interests which the Person has with respect to the Purchased Assets,

then (a) the Debtor(s) and the Buyer are hereby authorized and empowered to execute and file

such statements, instruments, releases and other documents on behalf of such person with respect

to the Businesses and (b) the Buyer is hereby authorized to file, register, or otherwise record a

certified copy of this Order, which shall constitute conclusive evidence of the release of record

and otherwise, of all Claims or Interests in the Businesses of any kind or nature whatsoever.

13.     At or upon the Closing, each of the Debtors' (Debtor's) creditors and any other

holder of Claims or Interests shall be deemed to have authorized the Buyer to execute such

documents and take all other actions as may be necessary to release Claims or Interests in the

applicable Businesses purchased by such Buyer, if any, as such Claims or Interests may have

been recorded or may otherwise exist.

## **Additional Provisions**

14.     The consideration provided by the Buyer for the Businesses pursuant to the

Agreement shall be deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code and under the laws of the United States, any state, territory,

possession, or the District of Columbia and Sale may not be avoided under section 363(n) of the Bankruptcy Code.

15.    This Order (a) shall be effective as a determination that, except for the applicable Assumed Liabilities, at the Closing, all Claims and Interests of any kind or nature whatsoever existing as to the Debtors or Businesses prior to the Closing have been unconditionally released, discharged and terminated as to the Buyer (including their successors and assigns) and their respective properties (including, without limitation, the Businesses), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, contract, or otherwise, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Businesses.

16.    Except as provided in the Agreement, after the Closing, the Debtor(s) and (its) their estate(s) shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such Claims are forever barred from asserting such Claims against the Debtor(s), their (its) successors or assigns, their (its) property or assets or estate(s).

17.    Each and every federal, state, and local governmental agency or department is hereby empowered to accept any and all documents and instruments necessary and appropriate to record the Sale.

18.    The so-called "bulk sale" laws in all applicable jurisdictions are waived or inapplicable as to the Sale.

19.   Except as otherwise expressly provided in the Agreement, the Buyer shall have no liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtor(s).

20.   This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the Agreement, any waivers and consents thereunder, and of each of the agreements and documents executed pursuant to or in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Businesses to the Buyer, (b) compel delivery of the Purchase Price or performance of other obligations under the Agreement owed by or to the Debtor(s), (c) resolve any disputes arising under or related to the Agreement, including disputes relating to the Assumed Liabilities, except as otherwise provided therein, or any of the agreements and documents executed pursuant thereto or in connection therewith, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Buyer against the assertion of any Claims and Interests against the Businesses (other than Assumed Liabilities, as applicable), of any kind or nature whatsoever.

21.   The transactions contemplated by the Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of any of the Acquired Contracts), unless such authorization is duly stayed pending such appeal.  The Buyer is a purchaser in good faith of the Businesses, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

22.     The terms and provisions of the Agreement and all related ancillary documents shall be binding on the parties thereto, and the provisions of this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor(s), its (their) estate, and creditors, the Buyer and its affiliates, successors, and assigns, and any affected third parties including, but not limited to, all persons asserting a Claim or Interest in the Businesses, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

23.     In the event of a conflict between this Order and the Agreement, this Order shall control.

24.     In the event of a conflict between this Order or the Agreement, on the one hand, and the terms of any plan of reorganization confirmed in the Debtors' (Debtor's) Chapter 11 case(s) or any order confirming such plan, on the other hand, this Order or the Agreement, as applicable, shall control.

25.     The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

26.     The Debtor(s) are (is) authorized and empowered to execute the Agreement or other related documents and agreements contemplated thereby or entered into in connection therewith and to consummate all transactions, and take any other actions, contemplated by, or necessary or appropriate to effectuate, the Agreement.

27.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms

hereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' (Debtor's) estate(s).

28.   The provisions of this Order are non-severable and mutually dependent and, pursuant to Bankruptcy Rules 6004 and 6006, this Order shall not be stayed for 14 days and shall be effective immediately upon entry.

**APR 2 7 2010**

Dated:  April __, 2010

_____
HON. PAMELA S. HOLLIS
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of this 15th day of March, 2010, by and among Perpetua Holdings of Illinois, Inc. d/b/a Cedar Park Funeral Home and Cemetery ("Cedar Park") and Perpetua-Burr Oak Holdings of Illinois, L.L.C. d/b/a Burr Oak Cemetery ("Burr Oak" and, together with Cedar Park, the "Sellers"), and CEMECARE, LLC, an Illinois Limited Liability Company ("Purchaser").

### RECITALS:

WHEREAS, Burr Oak owns and operates an active cemetery located at 4400 W. 127th Street, Alsip, Illinois (the "Burr Oak Business");

WHEREAS, Cedar Park owns and operates an active funeral home and cemetery located at 12540 S. Halsted, Calumet Park, Illinois (the "Cedar Park Business" and, together with the Burr Oak Business, the "Businesses");

WHEREAS, Pacesetter SBIC Fund, Inc. ("PSF") and MESBIC Ventures, Inc. ("MESBIC," along with PSF, the "Lenders") are lenders to and hold first liens on substantially all of the assets of the Cedar Park and the Burr Oak Cemeteries, including those used to operate the Businesses;

WHEREAS, this Agreement contemplates a transaction in which the Purchaser will acquire substantially all of the assets of the Businesses and assume certain liabilities of the Businesses, subject to the terms and conditions set forth in this Agreement;

WHEREAS, each of the Sellers filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") for relief in a bankruptcy case (collectively, the "Bankruptcy Case") filed under Chapter 11 of Title 11 of the United States Code 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date").

NOW, THEREFORE, the parties agree as follows:

1.    **Purchase of Assets.** Subject to the provisions of this Agreement and approval by the Bankruptcy Court, the Purchaser agrees to purchase, and the Sellers agree to sell, by bill of sale (unless by means of conveyance otherwise designated), all of Sellers' right, title and interest in and to all of the assets used in the operation of the Burr Oak and Cedar Park Businesses, including, but not limited to the following (collectively, the "Sale Property"), all of which shall be sold "as is" and "where is," with no representations or warranties of fitness or condition from the Sellers:

(a)    Real estate including, but not limited to, the real property and improvements thereon commonly known as 4400 W. 127th Street, Alsip, Illinois the legal description of which is attached hereto and incorporated herein as Exhibit A (the "Burr Oak Real Estate") and the real property and improvements thereon commonly known as 12540 S. Halsted, Calumet Park, Illinois the legal description of which is attached hereto and incorporated herein as Exhibit B (the "Cedar Park Real Estate" and, together with the Burr Oak Real Estate, the "Real Estate") which real estate shall be conveyed by the documents

{7236 AGR A0255230.DOC 2}                                         1

set forth in subparagraph 5(b):

      (b)    Equipment, machinery, furniture, fixtures, tools and inventory as set forth on Exhibit 1;

      (c)    All current and pending estimates, open orders, customer contracts and customer contacts;

      (d)    All books and records relating to the Sellers to the extent the same are assignable including, but not limited to, files and databases, customer lists and sales records, supplier lists and purchase records, employee records and files, files and records relating to commissions or other compensation, (collectively, the "Books and Records"), but excluding business organizational documents, corporate minute book, corporate seal, stock record books, financial records, income tax returns, checkbooks and cancelled checks (collectively, the "Excluded Books and Records"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Books and Records from each Business are transferred to the Purchaser of such Business. and, to the extent that any Books or Records are applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Book or Record and any cost associated therewith shall be split amongst each Purchaser.

      (e)    All computer hardware (including all peripherals, accessories, attachments and documentation associated therewith) and software (and all source codes, object codes and documentation associated therewith) owned or licensed by the Sellers on the Petition Date (the "Computer Hardware and Software"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Computer Hardware and Software from each Business are transferred to the Purchaser of such Business. and, to the extent that any Computer Hardware or Software are applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Computer Hardware or Software and any cost associated therewith shall be split amongst each Purchaser.

      (f)    All intangible assets or intellectual property, if any, pertaining to the Sale Property, including without limitation, all artwork, trademarks, trade names, patents (current and expired), patent rights, service marks, service names, brand names, domain names, websites, URLs, royalties, symbols, logos, slogans, designs, copyrights, technical know-how, sales techniques, methods, procedures, and all applications and renewal rights for, and all other rights associated with, all of the foregoing; all claims and rights, and benefits arising therefrom, with or against all persons or entities relating to the Sale Property, the rights to use all telephone and fax numbers in use by the Sellers as of the Petition Date (collectively, the "Telephone Numbers"); and the goodwill associated with the Business; and any and all other proprietary information, intangible or intellectual property pertaining to the Sale Property and belonging to or registered in the name of either Seller (collectively, the "Intangible Assets"); provided, however, in the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Telephone Numbers and Intangible Assets from each Business are transferred to the Purchaser of such Business. and, to the extent that any Telephone Numbers or Intangible Assets are applicable to each Business and/or

BURR OAK CEMETERY ASSET PURCHASE AGREEMENT A0255230 2.DOC 3/18/10

inseparable. then each Purchaser shall be entitled to retain its own copy of such Telephone Numbers or Intangible Assets and any cost associated therewith shall be split amongst each Purchaser.

(g)    All permits. licenses and approvals. to the extent they are assignable. including. without limitation. all environmental permits, if any (the "Permits");

(h)    All employment agreements and rights thereunder which Purchaser designates for assignment and assumption in Exhibit C:

(i)    All transferable prepaid insurance premiums (if insurance is assumed by the Purchaser), security deposits and vendor deposits arising in connection with the Business ("Prepaid Expenses"):

(j)    All claims and rights (and the benefits arising therefrom) with or against all persons whomsoever relating to the Sale Property:

(k)    Environmental Reports and Surveys:

2.    **Excluded Assets,**

(a)    Notwithstanding anything to the contrary contained herein. Sale Property does not include any of the following: (a) cash and cash equivalents: (b) all tax refunds whenever arising; (c) all Excluded Books and Records, (d) any and all causes of action belonging to Cedar Park or Burr Oak; (e) any and all insurance claims; (f) any and all claims against former owners of the Burr Oak Real Estate or the Cedar Park Real Estate; and (g) any and all claims against former operators of any business known as the Burr Oak Cemetery or Cedar Park Cemetery (collectively. the "Excluded Assets").

(b)    At or before the time of the Sellers' Sale. as defined in paragraph 4 below. Purchaser may. in its sole discretion. designate additional assets to be excluded from the Sale Property (such additional assets also referred to as "Excluded Assets").

3.    **Payment of Purchase Price.**

(a)    Concurrently with or prior to the execution and acceptance of this Agreement. the Purchaser shall. or shall have. deliver(ed) to the Sellers by wire transfer or cashiers' check, a sum equal to $60,000 (as defined below). which sum shall be held by the Sellers' counsel, Shaw Gussis Fishman Glantz Wolfson & Towbin LLC in its Client Trust Account. or such other account to which the parties hereto agree (together with all accrued interest, the "Deposit") pending the Closing, as defined in paragraph 5 below. In the event that the Purchaser is the successful bidder at the Sellers' Sale, then at the Closing. the Deposit will be delivered to the Sellers to be applied toward the "Purchase Price." as defined below, and the Purchaser shall pay to the Sellers the balance of the Purchase Price by wire transfer or cashiers' check in accordance with the Sellers' instructions. If the Purchaser is not the successful bidder at the Sellers' Sale. then subject to the provisions concerning the "Runner-Up Bid." as defined in paragraph 4 below. the Sellers shall immediately cause the Deposit to be returned to the Purchaser forthwith.

BURR OAK CEMETERY ASSET PURCHASE AGREEMENT (A0255230.DOC) 10/8/09

*1,010,000*                    ~~BF~~

(b)     The purchase price for the Sale Property shall be the sum of ~~SIX HUNDRED~~
~~SEVENTY FIVE THOUSAND AND NO/100 ($675,000.00)~~ DOLLARS (the "Purchase Price").
The portion of the Purchase Price allocable to the Burr Oak Real Estate shall be ~~Twenty Five~~
~~Thousand and No/100 Dollars ($25,000.00)~~ and the Cedar Park Real Estate shall be ~~Six Hundred~~
~~Fifty Thousand and No/100 Dollars ($650,000.00)~~ (reduced by proration as provided herein), and
the balance of the Purchase Price shall be allocable to the other Sale Property.

4.     **Method of Sale.**

(a)     The Sellers shall use commercially reasonable efforts to have the Bankruptcy
Court enter an order approving the bid procedures as discussed herein by April 2, 2010. and the
Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter an order
approving the sale by May 6, 2010. which date the Purchase may waive or extend in its reasonable
discretion: provided the Purchaser's bid is the Accepted Bid (defined below).

(b)     The parties hereto acknowledge that the Sellers shall advertise, to the public in
such manner as the Sellers. in their sole discretion. deem(ed) appropriate, that the Sale Property is for
sale as a single lot (i.e., both Businesses together) or in two distinct lots being sold as (i) the Cedar
Park Business and (ii) the Burr Oak Business. and will be sold: (i) to the highest and best bidder(s) at
a publicly advertised sale to be conducted by the Sellers at the offices of Shaw Gussis Fishman
Glantz Wolfson & Towbin LLC. 321 N. Clark Street. Suite 800, Chicago, Illinois at 1:30 p.m. on
April 26, 2010 (the "Sellers' Sale"). In connection therewith, the Sale Property and copies of this
Agreement (with the identity of the Purchaser(s) redacted) shall be available for examination by
other prospective purchasers or interested parties prior to the Sellers' Sale at such time or times as
the Sellers. in their sole discretion, deem appropriate. In the event that this Agreement has not been
terminated in accordance with paragraph 12 below by that time. the Purchaser's bid for the Sale
Property as set forth in this Agreement shall be the opening bid for the Sale Property.

(c)     The Sellers shall be authorized to receive and consider competing bids from
third parties up to 1:30 p.m. (CDT) on April 23, 2010 to purchase the Sale Property provided that
prior to the commencement of the Sellers' Sale. the Sellers have received from each of such third
parties a written offer(s) to purchase the Sale Property. which: (i) individually or collectively satisfies
the "Bid Protection" requirements set forth in paragraph 14(a) below: (ii) is on terms substantially
similar to those set forth in this Agreement or on better terms (as determined by the Sellers in their
sole and absolute discretion) for the Sale Property being purchased; (iii) is accompanied by a
cashiers' check or wire transfer payable to the Sellers in an amount equal to 7.5% percent of the
Purchase Price. which has been delivered to Sellers at least 24 hours prior to the commencement of
the Sellers' Sale; and (iv) on such other terms as the Sellers may announce prior to or at the Sellers'
Sale that are not in contravention of the terms described herein (each, a "Qualifying Bid").

(d)     In the event that a Qualifying Bid(s) is received for the Sale Property. the
Sellers will continue at the Sellers' Sale to seek higher bids for the Sale Property, in an auction
format. in minimum increased increments of at least $10,000.00. if such bidding is for both
Businesses or solely for the Cedar Park Business or. $5,000 if such bidding is solely for the Burr Oak
Business until no further bids are made. In the event that there is no Qualifying Bid for the Sale
Property. and in the event that this Agreement has not been terminated pursuant to paragraph 12
below. the Purchaser's bid as set forth in this Agreement shall be deemed accepted by the Sellers for

the sale of the Sale Property, subject (a) the Sellers right to withdraw its sale of the Burr Oak Business and (b) Purchaser's right to withdraw its offer to purchase the Burr Oak Business pursuant to section 6 of the Rider.

(e)    In the event that the highest and best offer, as determined by the Sellers in their sole and absolute discretion, is submitted at the Sellers' Sale for the Sale Assets by a purchaser(s) other than the Purchaser, then the Sellers shall be entitled to accept such other bids, which offer(s) shall be deemed the "Accepted Bid," and in the Sellers' sole and absolute discretion, announce the next highest or otherwise best bid to constitute a runner-up bid ("Runner-Up Bid"). In making their determination of what constitutes the Accepted Bid and the Runner-Up Bid, the Sellers will consider any factors they deem appropriate, in their sole and absolute discretion.

(f)    In the event that the Accepted Bid is submitted by a party(ies) other than the Purchaser, and the Purchaser's bid herein (or as amended by the Purchaser at the Sellers' Sale in response to competitive bidding) is declared to be the Runner-Up Bid by the Sellers, the Purchaser hereby agrees to keep its offer to purchase the Sale Property open for a period not to exceed seven (7) calendar days from the date of the Sellers' Sale. The party submitting the Runner-Up Bid shall also be so required to keep its bid open. In the event that such Accepted Bid closes within said seven (7) days, then effective upon the closing, this Agreement shall be considered null and void and of no legal effect whatsoever and the Sellers shall pay the "Breakup Fee," as defined in paragraph 14 below, to the Purchaser, within three (3) business days after such closing, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(g)    In the event that the Accepted Bid fails to close because of a breach or failure to perform on the part of such bidder, then the Sellers, in their sole and absolute discretion, may accept the Runner-Up Bid in writing within seven (7) calendar days after the date of the Sellers' Sale, in which case the party(ies) submitting the Runner-Up Bid, including the Purchaser if applicable, shall be required to consummate the transactions contemplated in the Runner-Up Bid within the thirty (30) calendar days following the Sellers' Sale. If the Purchaser is the holder of such Runner-Up Bid, then the Purchaser shall not be entitled to receive all or any portion of the Breakup Fee.

(h)    If the Purchaser is not the Accepted Bid or the Runner-Up Bid, then upon the conclusion of the Sellers' Sale, this Agreement shall be considered null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee, to the Purchaser within three (3) business days after the conclusion of the Sellers' Sale, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.

5.    Closing.

(a)    Closing Date.  Subject to the terms and conditions of this Agreement and approval by the Bankruptcy Court, and if the Purchaser submits the Accepted Bid, the closing of the transactions contemplated herein (the "Closing") shall be held within seven (7) days from and after the conclusion of the Sellers' Sale at the offices of the Sellers' counsel or such other date and place as the Purchaser and the Sellers may agree, but in no event later than 5:00 p.m., May 7, 2010 (the "Closing Date").

(b)    Sellers' Deliveries at Closing. At the Closing, the Sellers shall execute and deliver or cause to be executed and delivered to the Purchaser the following:

(i)    A final and non-appealable order from the Bankruptcy Court in a form substantially acceptable to Purchaser, providing and authorizing the Sellers' Sale of the Sale Property to Buyer under 11 U.S.C. § 363 free and clear of all liens, claims and encumbrances.

(ii)    A Sellers' Bill of Sale for the Sale Property in form acceptable to Purchaser, transferring all of Sellers' right, title and interest therein, free and clear of any and all liens, claims or encumbrances;

(iii)    UCC-3 termination statements as to all of the Sale Property sold to the Purchaser in recordable form and, if necessary, executed by the appropriate officer(s) of the Sellers and the Lenders;

(iv)    A release and satisfactory mortgage in recordable form releasing the mortgage interest of the Lenders in the Real Property;

(v)    A Quit Claim Deed from the owner of the Real Estate conveying all of such owner's right, title and interest in the Real Estate to Purchaser's designee;

(vi)    At Sellers' expense, an Owner's Policy of Title Insurance issued by Chicago Title & Trust Company with extended coverage in the amount of the Purchase Price for the Real Estate showing fee simple title to the Real Estate vested in Purchaser, subject only to non-delinquent taxes and assessments and Permitted Exceptions with the following endorsements as applicable:

(a)    contiguity;

(b)    tax parcel;

(c)    zoning (including parking);

(d)    survey; and

(e)    access.

(vii)    A real estate transfer tax declaration in customary form;

(viii)    Uniform Commercial Code financing statement and special searches of the records of the Secretary of the State of Illinois and the Recorder of Deeds of Cook County, satisfactory to Purchaser;

(ix)    A certification of non-foreign status in the form prescribed by Section 1445(b)(2) of the Internal Revenue Code;

{7236 AGR A0255230.DOC 2}                     6

{7236 OAK CEMETERY\ASSET PURCHASE AGREEMENT\A0255230-2.DOC 3/28/10

(x)    Sufficient information, to the extent reasonably available to the Sellers. to enable the party responsible for closing the transaction contemplated by this Agreement to comply with the provisions of Section 6045(e) of the Internal Revenue Code and any state revenue or tax laws relating to the transaction contemplated by this Agreement;

(xi)    Payment of all transfer taxes with respect to the sale of the Real Property; and

(xii)    Such other instruments and documents as the Purchaser shall reasonably request to consummate the transactions contemplated in this Agreement.

(c)    Purchaser's Deliveries at Closing. At the Closing. the Purchaser shall execute and deliver or cause to be executed and delivered to the Sellers the following:

(i)    The Purchase Price, less the Deposit and prorations. by cashiers' check or wire transfer;

(ii)    Proof of Purchaser's receipt of all required licenses and certifications required to own and operate a cemetery and funeral home in the state of Illinois. Cook County. Illinois and Alsip and Calumet Park. Illinois; and

(iii)    Such other instruments and documents as the Sellers shall reasonably request to consummate the transactions contemplated in this Agreement.

6.    **Delivery and Condition of the Sale Property.**

(a)    Immediately upon completion of the Closing. the Sellers shall be deemed to have fully and completely turned over to the Purchaser the possession, custody and control of the Sale Property and all keys to the Real Estate. In connection therewith. the Sellers shall be deemed to have vacated the Real Estate and the Sale Property concurrently upon the Closing. The Purchaser agrees that neither the Sellers nor the Lenders are assuming and accordingly, shall not be liable or responsible for any or all liabilities or obligations of any kind or nature whatsoever arising out of, under. or related to the Real Estate and/or the storage. use. removal. sale. transfer, conveyance or other disposition of the Sale Property from and after the Closing.

(b)    The Purchaser agrees that it is purchasing and shall take possession of the Sale Property in their AS IS, WHERE IS condition and acknowledges that it has previously been given the opportunity to and has conducted such investigations and inspections of the Sale Property as the Purchaser has deemed necessary or appropriate for the purposes of this Agreement. Upon the execution of this Agreement by all parties hereto. the Purchaser agrees that it shall be deemed to have completed all of its due diligence with respect to the transactions contemplated herein.

(c)    Except as expressly provided for herein, the Purchaser acknowledges and agrees that neither the Sellers, the Lenders, or their advisors have made, and hereby do not make, any express or implied representations, statements, warranties, or conditions of any kind or nature whatsoever concerning the Sale Property, including without limitation of the generality of the foregoing. the ownership, condition, working order, sufficiency, quantity

and/or quality of any or all of the Sale Property; any warranty of title, possession, quiet enjoyment or the like; the assignability of the leases or any of them, any of the Real Estate's environmental status and conditions, roof, heating, central cooling, ventilating, lighting, plumbing and electrical fixtures and systems, basement flooding, leaks, seepage, insect infestation; the ability to use the Telephone Numbers; the Sellers, their customers, creditors, employees, assets, liabilities, business, operations, profitability or lack thereof, projections, estimates, budgets, or any other matters of any kind or nature whatsoever arising out of, under or related to the Business and/or the matters leading up to this Agreement; the completeness or accuracy of the Sellers' past or present financial statements, Books and Records and other financial information; or any and all implied warranties of merchantability or fitness for a particular purpose, except that the Sale Property is being sold free and clear of all liens, claims and encumbrances of the Sellers and the Lenders.

(d)     The Purchaser agrees that it shall be solely responsible and liable for any loss, cost, damages, expenses or liabilities of any kind or nature whatsoever arising out of, under or related to the Purchaser's storage, use, removal, sale, transfer, conveyance or other disposition of the Sale Property from and after the Closing.

7.     Due Diligence and Conditions Precedent to Obligations of Parties to Close.

(a)     The obligations of the Sellers to proceed with the Closing under this Agreement and to consummate the transactions contemplated herein are subject to the outcome of the Sellers' Sale as set forth above, and the fulfillment of the condition that all of the Purchaser's representations, warranties and covenants contained herein shall be true and correct as of the Closing, with the same force and effect as though such representations, warranties and covenants had been made on, as of and with reference to the Closing; provided, however, the Sellers, in their sole and absolute discretion, may waive the failure to occur of any of the foregoing conditions precedent to their obligations to proceed with a Closing under this Agreement; and

(b)     The obligations of the Purchaser to proceed with the Closing under this Agreement and to consummate the transactions contemplated herein are subject to the following: (i) the outcome of the Sellers' Sale as set forth above and the fulfillment of the condition that Sellers shall have complied with all terms of this Agreement and all of the Sellers' representations, warranties and covenants contained herein shall be true and correct as of the Closing, with the same force and effect as though such representations, warranties and covenants had been made on, as of and with reference to the Closing; (ii) prior to the Sellers' Sale, that there is no occurrence or litigation pending that attempts to stay or otherwise prohibit the Sellers' rights to sell their interests in the Sale Property to the Purchaser; (iii) the Sellers shall not have sold, leased, transferred, conveyed, assigned or disposed of in any manner whatsoever, any of the Sale Property, except in the ordinary course of business; and (iv) the Sellers shall have paid, or set aside, sums sufficient to pay through the Closing, for those employees who will be hired by the Purchaser, all regular wages, salaries and covered applicable health insurance premiums due to/for such employees; provided, that the Purchaser, in its sole and absolute discretion, may waive the failure to occur of any of the foregoing conditions precedent to its obligations to proceed with a Closing under this Agreement.

8.     Pre-Closing Covenants. Between the date hereof and the Closing, the parties hereto each hereby covenant and agree, as the case may be, as follows:

{7236 AGR A0255230.DOC 2}                           8

INTER OAK CEMETERY (ASSET PURCHASE AGREEMENT (A) A0255230 3).DOC 3}{8)0

(a)    The Sellers shall not sell. lease. transfer. convey, assign or dispose of in any manner whatsoever. any of the Sale Property. except in the ordinary course of the Business;

(b)    The Sellers agree to use all reasonable diligence to operate the Business in the ordinary course of business as the same has been operated since the Petition Date through the Closing. except as otherwise disclosed in writing to Purchaser;

(c)    The Sellers agree to use all reasonable diligence to maintain and preserve the Sale Property prior to the Closing in their present state and condition in all material respects. subject only to ordinary wear and tear and the ordinary course of Business:

(d)    Each party agrees not to knowingly take, or fail to take, any action which by reason of taking or such failure to take would make any representations or warranties of each party herein materially untrue. inaccurate or otherwise misleading; and

(e)    Each party agrees to take all corporate or organizational actions, as the case may be. and any other action reasonably necessary to consummate and carry out the transactions contemplated herein.

9.    <u>Liabilities Generally Not Assumed</u>.

(a)    From and after the Closing. the Purchaser is not assuming. nor shall it in any way be liable or responsible for. any liabilities. obligations or debts of the Sellers relating to the Business. the Sale Property or otherwise. or the operation of the Business prior to Closing. whenever arising and whether known or unknown, primary or secondary, direct or indirect, absolute or contingent. contractual. tortious or otherwise. other than those set forth in paragraph 9(b) below.

(b)    Notwithstanding the foregoing paragraph 9(a), Purchaser shall assume the Seller's obligations under its "Pre-Need" contracts with customers and for deeded lots, as set forth on Schedules 9(b)(1) and (2) hereto, respectively.

10.    <u>Sellers' Representations and Warranties</u>. The Sellers, in order to induce the Purchaser to enter into this Agreement, hereby covenant. represent and warrant to the Purchaser with the intent and understanding that it is expressly relying thereon as a material inducement to enter into this Agreement as follows:

(a)    The Sellers have full rights. powers and authority to execute this Agreement and consummate the transactions contemplated herein:

(b)    The Sellers have provided and shall provide adequate published notice of the Sellers' Sale to satisfy all fair notice requirements in law and equity:

(d)    The representative executing and delivering this Agreement on behalf of the Sellers has full right, power and authority and is duly authorized and empowered to enter into, execute. deliver and perform under this Agreement. and upon execution and delivery. this Agreement will be a valid. binding, subsisting and enforceable obligation of the Sellers and the Lenders:

RUBY OAK CEMETERY/ASSET PURCHASE AGREEMENT/A0355230.2 DOC 3(0/10

(e)    The Sellers have not heretofore, sold, transferred, pledged, conveyed or otherwise disposed of their rights, title and interest in and to the Sale Property;

(f)    The Sellers have made reasonable efforts to comply with all necessary provisions of Federal law and Illinois law in order to consummate the transactions contemplated in this Agreement; and

(g)    The Seller will have obtained a final and non-appealable order from the Bankruptcy Court authorizing the sale of the Sale Property.

11.    <u>Purchaser's Representations and Warranties</u>. The Purchaser, in order to induce the Sellers to enter into this Agreement, hereby covenants, represents and warrants to them with the intent and understanding that they are expressly relying thereon as a material inducement to enter into this Agreement as follows:

(a)    The Purchaser is a limited liability company duly authorized, existing and in good standing under the laws of the state of Illinois and has full rights, powers, and authority to execute this Agreement and consummate the transactions contemplated herein and the Purchaser's Sellers, if any, at Closing, will be an entity duly authorized validly existing and in good standing under the laws of its state of organization and will have the full rights, power and authority to consummate the transactions contemplated hereby;

(b)    This Agreement: (i) has been duly authorized by all necessary corporate actions on the part of the Purchaser and that such corporate actions have not been modified or rescinded; (ii) does not and will not violate the provisions of the Purchaser's Operating Agreement or any applicable law, regulation, judgment, or order, or of any agreement, instrument or obligation by which the Purchaser or its properties are bound and if this Agreement is assigned by Purchaser prior to Closing, this Agreement will be duly authorized by all necessary company action on the part of such Sellers and that such company action will not violate the provisions of the Sellers' formation documents and bylaws or operating agreement, as the case may be, or any applicable law, regulation, judgment, or order, or of any agreement, instrument or obligation by which such Sellers or its properties are bound;

(c)    Promptly upon the execution of this Agreement, Purchaser will take any acts necessary for it to obtain all licenses and certifications required to own and operate a cemetery and funeral home in the state of Illinois, Cook County, Illinois and Calumet Park, Illinois, and use its best efforts to obtain the same; and

(d)    The representative executing and delivering this Agreement on behalf of the Purchaser is duly authorized and empowered to act.

12.    <u>Termination and Remedies</u>. This Agreement and the transactions contemplated herein may be terminated prior to Closing pursuant to any of the following:

(a)    By the mutual written consent of the Sellers and the Purchaser, in which case, this Agreement shall be null and void and of no legal effect whatsoever, and each party hereto shall

{7236 AGR A0255230.DOC 2}                        10

BIJOU DAY CLUSTERS (ASSET PURCHASE AGREEMENT) (11/10511210.DOC_14980)

suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement;

(b)    Upon the Sellers' acceptance of an Accepted Bid by a party other than the Purchaser which Accepted Bid thereafter closes, or if the Purchaser is not the Accepted Bid or the Runner-Up Bid, whether or not the Sellers close on either bid, this Agreement shall be null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee to the Purchaser, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement; or

(c)    If the Purchaser is not in default hereunder and the Sellers fail to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of the Purchaser, then the Purchaser shall have the right to: (1) terminate this Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever and the Sellers shall pay the Breakup Fee to the Purchaser within three (3) business days after termination hereof; or (2) waive or agree to modify the occurrences causing the Sellers' inability to consummate the transactions contemplated herein, after which the Purchaser shall be required to consummate the transactions contemplated herein.

13.    Brokers.  The Purchaser represents and warrants that it has not engaged, consented to, or authorized any other broker, investment banker, or other third party to act on its behalf, directly or indirectly, as a broker or finder in connection with the transactions contemplated by this Agreement, and that no such other third party is entitled to any fee or compensation in connection with this Agreement or the transactions contemplated hereby by reason of any action of it.  The Purchaser shall indemnify, defend and hold harmless the Sellers from any and all claims of any broker, investment banker, or other broker or finder, other than Broker, arising by, through or under it in connection with this transaction.

14.    Bid Protection and Breakup Fee.

(a)    Subject to approval by the Bankruptcy Court, the Purchaser shall receive bid protection in an amount equal to (i) $35,000.00 over the Purchase Price with regard to bids for either (i) both Businesses, together, or for Cedar Park Business, alone and (ii) $5,000 for bids on Burr Oak business, alone.  The Sellers shall not accept at the Sellers' Sale any Qualifying Bid(s) unless such competing offer(s), either individually or collectively, provide the Sellers with consideration at the Closing in excess of $35,000.00 over the Purchase Price.

(b)    Subject to paragraphs 4 and 12 above, if this Agreement is terminated due to the Sellers' acceptance of a higher and better Qualifying Bid submitted at the Sellers' Sale for either both the Businesses, together, or the Cedar Park Business, alone, and such transaction closes, or in such other cases as described herein for which the Purchaser is entitled to the Breakup Fee, then the Sellers shall cause a payment to be made to the Purchaser in an amount equal to $25,000.00 (the "Breakup Fee") within the time period specified therein, that shall be deemed to satisfy in full any and all losses, costs, expenses, or damages of Purchaser arising out of, under or related to this Agreement.  Purchaser will not be entitled to a break up fee solely on account of the sale of the Burr Oak Business to another entity.

15.    Prorations.  The Sellers shall be responsible for, and pay, all expenses required to be

{7236 AGR A0255230.DOC 2}                    11

{BURR OAK CEMETERY - ASSET PURCHASE AGREEMENT) (04/26/2010 ).DOC 2/DOC 2/DOC

paid hereunder and all prorations with respect to the Business and the Sale Property accruing up to 11:59 p.m. on the day of Closing, except as otherwise expressly provided herein. All prorations shall be made to the extent reasonably practicable on the basis of actual days for a 365-day year and with respect to the Real Property, real estate taxes shall be prorated based upon the most recent real estate tax bill and the following additional charges shall be prorated: water, utilities, insurance (if being assumed by Purchaser) and contracts related to the Real Estate being assumed by Purchaser. If the exact amount of prorations cannot be determined at the Closing, the same shall be adjusted at the Closing based on the parties' good faith estimate and the Purchase Price shall be adjusted accordingly and the Sellers shall retain adequate resources for the reproration of such items within ninety (90) days following the Closing Date.

16.    Survival.   The representations, warranties and covenants contained herein shall survive the execution and delivery of this Agreement and Closing until barred by applicable statute of limitations.

17.    Post-Closing Obligations.

(a)    The Purchaser agrees to make the Books and Records, wherever located, available for inspection by the Sellers or by their duly authorized representatives, at no charge, for reasonable business purposes at all reasonable times during normal business hours, for a three (3) year period after the Closing, with respect to the operation of the Business occurring prior to and relating to the Closing, and the historical financial condition, assets, liabilities, operations, and cash flows of the Sellers prior to the Closing. As used in this section, the right of inspection includes the right to make extracts or copies at the requesting party's sole cost. Any party or representative of such party shall give the Purchaser at least two (2) business days notice prior to such inspection. The representatives of the Sellers inspecting the Books and Records shall be reasonably satisfactory to the Purchaser, and the Purchaser can require such confidentiality agreements as are reasonable under the circumstances.

(b)    In the event that the Burr Oak Business and the Cedar Park Business are not purchased by the same buyer, both the Purchaser and the other buyer shall use their best efforts to insure that the applicable Sale Property from each Business is transferred to the Purchaser of such Business, and, to the extent that any Sale Property is applicable to each Business and/or inseparable, then each Purchaser shall be entitled to retain its own copy of such Sale Property and any cost associated therewith shall be split amongst each Purchaser.

(b)    The Sellers agree to make the Excluded Books and Records, wherever located, available for inspection by the Purchaser and its duly authorized representatives, at no charge, for reasonable business purposes at all reasonable times during normal business hours, for a one (1) year period after the Closing. As used in this section, the right of inspection includes the right to make extracts or copies at the requesting party's sole cost. The Purchaser or representative of the Purchaser shall give the Sellers at least two (2) business days notice prior to such inspection. The representatives of the Purchaser inspecting the Excluded Books and Records shall be reasonably satisfactory to the Sellers, and the Sellers can require such confidentiality agreements as are reasonable under the circumstances.

(c)    For a period of one hundred eighty (180) days after the Closing, the Purchaser

shall afford the Sellers or their duly authorized representatives reasonable access to such Facilities still occupied by the Purchaser, at no cost to the Sellers, to assist the Sellers in completing the administration of the Bankruptcy Case.

18.   **Amendment and Modification.** This Agreement may be amended, modified or supplemented only by written agreement of the parties hereto.

19.   **Severability.** Any provision of this Agreement that shall be prohibited or unenforceable shall be deemed ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

20.   **Entire Agreement.** This Agreement, including those documents identified herein or appended hereto as Exhibits, constitutes the entire contract between the parties relating to the subject matter hereof and is the final and complete expression of their intent. No prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing, have been made by the parties, or any of them, in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated into this Agreement; it being the intention of the parties hereto that in the event of any subsequent litigation, controversy, or dispute concerning the terms and provisions of this Agreement, no party shall be permitted to offer to introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing.

21.   **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Illinois.

22.   **Counterparts.** This Agreement may be executed in one or more counterparts, all of which taken together constitute one and the same instruments. A signed counterpart is as binding as an original. A facsimile signature shall be treated as an original signature.

23.   **No Contract until Execution.** This Agreement shall become valid and binding only after it is executed and delivered by the parties. Until execution hereof, it is the intention of the parties that (a) no agreement, contract, offer of agreement or proposal arises and (b) no estoppel is created by the submission of any draft hereof or any other conduct of the parties.

24.   **Expenses.** Except as otherwise expressly set forth herein, each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including, without limitation, attorneys, accountants, and other professional fees and expenses.

25.   **Non-Waiver.** The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in

writing and signed by an authorized representative of the waiving party.

26.    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

27.    **Future Deliveries.**  The parties shall execute such further documents, and take such other actions, as may be reasonably necessary to transfer and convey the Sale Property to the Purchaser on the terms contained herein and to otherwise comply with the terms and conditions of this Agreement and consummate the transactions herein provided.

28.    **Time.**  Time is of the essence of this Agreement.

29.    **Notices.**  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States express mail.  Notices shall be deemed given on the first business day following receipt; provided, however, that a notice delivered by facsimile shall only be effective if such notice is also delivered by hand.  All notices shall be addressed as follows (or to such other address as any party shall have advised the others in writing):

If to the Sellers addressed to:

> Brian L. Shaw
> Shaw Gussis Fishman Glantz
>   Wolfson & Towbin LLC
> 321 North Clark Street, Suite 800
> Chicago, Illinois 60610
> Fax No.: (312) 980-3888

With copies to:

> Mr. Melvin Bryant

If to The Purchaser addressed to:

CEMECARE, LLC
4161 West 166th Street, Suite A
Oak Park, Illinois  60452

With copies to:

Philip L. Mandell
Pitler and Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois  60603

(7236 AGR A0255230.DOC 2)                              14

BURR OAK CEMETERY/ASSET PURCHASE AGREEMENT/3/30MANDELLDOC 3/30/10

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this paragraph.

30.    **Assignability.** This Agreement shall not be assignable by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed, except that the Purchaser shall have the right in its sole discretion to assign its rights and obligations under the Agreement to any affiliated entity, in which case that entity shall be thereafter deemed to be the "Purchaser" for purposes of this Agreement and all documents executed in connection herewith.

31.    **Headings.** The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

32.    **Construction of Terms.** This Agreement has been drafted jointly by the parties in full consultation with their respective attorneys, and no ambiguity in this Agreement shall be interpreted or construed against any of the parties as the drafter hereof.

34.    **Incorporation by Reference.** The recitals hereto and all schedules and exhibits attached hereto shall be deemed an integral part of this Agreement and shall be incorporated herein by reference.

<u>SEE RIDER ATTACHED HERETO AND MADE A PART HEREOF</u>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

SELLERS:

PERPETUA HOLDINGS OF
ILLINOIS, INC.

By: _____

Its: _____

PERPETUA-BURR OAK
HOLDINGS OF ILLINOIS, L.L.C.

By: _____

Its: _____

BURR OAK CEMETERY ASSET PURCHASE AGREEMENT A0255230 3.DOC 3/18/10

PURCHASER:

**CEMECARE, LLC,**
an Illinois Limited Liability Company

By: _Lafayette Ferling Sr._

Its: _____

Willie Ferling   3-25th 2010

HICKORY OAK CEMETERY ASSET PURCHASE AGREEMENT (FINAL) 032510 2.DOC   3/8/10

THIS RIDER IS ATTACHED TO AND MADE A PART OF THAT
CERTAIN ASSET PURCHASE AGREEMENT BY AND AMONG
PERPETUA HOLDINGS OF ILLINOIS, INC., d/b/a CEDAR PARK
FUNERAL HOME AND CEMETERY AND PERPETUA-BURR OAK
HOLDINSG OF ILLINOIS, L.L.C., d/b/a BURR OAK CEMETERY
TOGETHER WITH CEDAR PARK (SELLER), AND CEMECARE, LLC,
AN ILLINOIS LIMITED LIABILITY COMPANY (PURCHASER)

R-1.    In the event of a conflict between (a) the terms and conditions set forth in
the Asset Purchase Agreement and this Rider, in all instances this Rider shall
supersede and be in full force and effect or (b) the terms and conditions of this Rider or
the Asset Purchase Agreement, on the one hand, and any Order of the Bankruptcy
Court regarding the sale under the Asset Purchase, the Order shall prevail.

R-2.    Purchaser shall have until March 30, 2010 ("Due Diligence Period") to
review the books and records maintained by Seller in connection with the operation of
the Cemetery and business and to confirm that the amount of the trust funds and
perpetual care funds are maintained and are transferable to Purchaser.

R-3.    The consummation of his transaction is further contingent upon the entry
of an order of the Bankruptcy Court selling the Sale assets free and clear of any liens,
claim and encumbrances, including any claims and expenses arising form the prior
operation of the Businesses, unless expressly assumed under the Asset Purchase
Agreement, under section 363 of the Bankruptcy Code in a form reasonably acceptable
to Purchaser.

R-4.    Purchaser shall confirm compliance with all laws with respect to
employment, employment practices, terms and conditions and that Seller has fulfilled its
obligations to the extent applicable under the minimum requirements of ERISA and all
applicable Income Tax provisions and that there are no outstanding deferred
compensations, severance, pension and profit sharing, retirement plans and bonuses
due and owing.

R-5.    Purchaser will use its best efforts to obtain all licenses within the required
time limit, but in the event Purchaser is unable to do so, the closing of the transaction
will be extended until such licenses are procured.

R-6.    Purchaser shall have the right to rescind its proposal to acquire Burr Oak
up through and until April __, 2010 (__ days prior to the Auction Date). At that time, at
Purchaser's option, the amount of money allocated to the Purchase Price of Burr Oak
shall be added to the Purchase Price of Cedar.

R-7.    Seller has made Purchaser aware of certain "Pre-Need" Contracts with customers, including but not limited to an Executory Contract to build a mausoleum on the Cedar Park real estate.  Purchaser shall have until the conclusion of the Due Diligence Period to review the various "Pre-Need" Contracts with customers for deeded lots, including the agreement to build the mausoleum and to terminate and rescind this Agreement and obtain a refund of all of its earnest money.

IN WITNESS WHEREOF, the parties hereto have executed this Rider to Asset Purchase Agreement as of the date first above written.

SELLER:

PERPETUA HOLDINGS OF ILLINOIS, INC.,
d/b/a Cedar Park Funeral Home and
Cemetery, and PERPETUA-BURR OAK
HOLDINGS OF ILLINOIS, L.L.C., d/b/a BURR
OAK CEMETERY, Together with CEDAR
PARK

By: _____

   Its: _____

PURCHASER:

CEMECARE, LLC, an Illinois Limited
Liability Company

By: _____

By: _____

LAW OFFICES

## PITLER AND MANDELL

BARRY A. PITLER (1931-1999)
PHILIP L. MANDELL
SIGI M. OFFENBACH

39 SOUTH LA SALLE STREET - SUITE 1220
CHICAGO, ILLINOIS 60603
TELEPHONE (312) 782-9466
FACSIMILE (312) 782-3493

PHILIP L. MANDELL
phil@pitlerandmandell.com
SIGI M. OFFENBACH
sigi@pitlerandmandell.com

April 22, 2010

*VIA FAX/MAIL/E-MAIL*
*(312) 980-3888*
*bshaw@shawgussis.com*

Brian L. Shaw, Esq.
Shaw Gussis Fishman Glantz
Wolfson & Towbin, LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654

Re:   *Asset Purchase Agreement*
    Sellers:    *Perpetua Holdings of Illinois, Inc., d/b/a*
             *Cedar Park Funeral Home and Cemetery,*
             *Perpetua Burr Oak Holdings of Illinois, LLC, d/b/a*
             *Burr Oak Cemetery, together with Cedar Park*
    Purchaser:  *CEMECARE, LLC*

Dear Mr. Shaw:

As you are aware, our client, CEMECARE, LLC, as Purchaser, previously executed a Asset Purchase Agreement ("Agreement") with your clients, as Sellers. to acquire certain assets and real estate of Burr Oak Cemetery ("Burr Oak") and Cedar Park Funeral Home and Cemetery ("Cedar Park").

Pursuant to the terms and conditions of the Agreement. Purchaser has the right to rescind its proposal to acquire Burr Oak up through and including April 23. 2010.

Please let this letter stand as the Purchaser's request for an extension of time in order to exercise its right to acquire Burr Oak subject to the following:

1)    A confirmation of a Plan to acquire said assets which Plan will be approved by the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, in the matter of *In Re: Perpetua-Burr Oak Holdings of Illinois, L.L.C.. et al..* Case No. 09-34022, now pending before the Honorable Judge Pamela S. Hollis.

2)    The Plan would include the absolute right of Purchaser to utilize, without restriction, approximately ten (10) acres of vacant burial sites of Burr Oak Cemetery at or near 123rd Street.

Brian L. Shaw, Esq.
Shaw Gussis Fishman Glantz
Wolfson & Towbin, LLC
April 22, 2010
Page -2-

3)  The Plan would include a provision that the Purchaser would have the right to receive certain funds to be deposited in Escrow for its use in connection with repairs of the cemetery, drainage, road improvements, landscaping, removal of trees, fence restoration, drainage tiles, improvements to the Office Building and garage, lot markers, a survey of available burial spaces, together with deposit of additional perpetual care funds. The amount of all the funds to be deposited is subject to the agreement of all necessary parties and would be part of the Plan.

Please note the above represents our client's offer and commitment to purchase Burr Oak subject to the above conditions being met and fulfilled to the satisfaction of our client.

If the above is acceptable, please execute a copy of this letter indicating the Sellers' acceptance and fax the same to me. If the above is not acceptable, please let this letter stand as the Purchaser's request that its proposal to acquire Burr Oak be rescinded.

Sincerely yours,

Philip L. Mandell

PLM:jp

cc:  Daniel A. Zazove/Perkins Coie LLP (Via Fax and E-mail)
      Cemecare, LLC
      Melvin Bryant, c/o Perpetua Holdings of Illinois, Inc. and
              Perpetua-Burr Oak Holdings of Illinois, LLC

ACCEPTED and APPROVED this 23rd
day of April, 2010

Brian L. Shaw, attorney for Sellers

# EXHIBIT B

## SCHEDULE 9(B)1 TO SALE AGREEMENT
## DATED MARCH 15, 2010

**Lists of pre-need obligations excluded from copy of Agreement attached
to Bankruptcy Court order dated April 27, 2010**



# COLD SPRING GRANITE™

17482 Granite West Road, Cold Spring, MN 56320-4578 USA
800-328-5040    320-685-3621

# *INVOICE*

**SOLD TO:**   *CEDAR PARK CEMETERY*
*PO BOX 65026*
*TUCSON, AZ 85728*

All claims for deductions must be made within five days from receipt of goods

| Invoice Number | Our Order Number | Terms | Date | Your Order Number |
|---|---|---|---|---|
| *2006754104* | *202438* | **PAYMENT BEFORE SHIPMENT** | **15-Feb-10** | |

| DESCRIPTION | AMOUNT |
|---|---|
| RE: *216 CRYPT MAUSOLEUM*      A/R Category: *5301* | |
| Contract Total:   **$195,043.00**   As Of: **15-Feb-10** | |
| | $    195,043.00 |
| For granite provided per our contract: | $    100,256.00 |
| Less amount previously invoiced: | |
| **Total amount due this invoice:** | $     94,787.00 |
| **Sales Tax Breakout** | |
| Granite: $   94,787.00 | |
| Tax: $              - | |
| Total: $   94,787.00      USD | |

Please Remit Payment to:
Cold Spring Granite Company
c/o Harris Bank
P.O. Box 71037
Chicago, IL  60694-1037

Form #CR-021-96 Rev 3/97

# I N V O I C E

202438

**GRANIT BRONZ**
DIVISION OF COLD SPRING GRANITE COMPANY
**PROPOSAL & CONTRACT**

═ COLD SPRING ═
Quarters and fabricators of building stone and memorialization products.
202 S. 3rd Avenue, Cold Spring, MN 56320 USA
Phone: 800-328-5040     Fax: 320-685-5008

PROJECT: 216 Crypt Garden Mausoleum
LOCATION: Calumet Park, IL
JOB NUMBER: 06-7541
PHONE: 773-785-8840
FAX: 708-388-0061

DATE: 08 Mar 2006
ATTN: Rahsaan Brown
COMPANY: Cedar Park Cemetery
12540 South Halsted Street
Calumet Park, IL 60827

Unless revoked earlier in accordance with the attached Terms & Conditions, this quote expires after 30 days.
GRANIT BRONZ (Hereinafter "Seller") of Cold Spring, MN, proposes to furnish materials as described below.
The following bid documents, drawings & specifications will be referred to as Contract Documents and shall apply insofar as these documents
do not conflict with the terms and conditions of this contract.
                    GRANITE MAUSOLEUM UNITS : DESIGN
Granite material, drawings and specifications for granite material, shown on original drawing, setting of the mausoleum unit including
caulking, sand and mortar; unloading of all material named herein; and all interior crypts as specified on approved shop drawings are made a
part of this contract. No other material, labor or services will be provided unless expressly specified in writing.
                    REFERENCE:216 Crypt Garden Mausoleum

**See attached Addendum "A-3", dated March 8, 2006.**

**Addendum "A-3" is part of this contract.**

MATERIAL / FINISH: Sunset Red, Moonlight Gray / Polish, Thermal, and Sawn

The Contract Documents, so far as they relate to material listed herein, are made a part of this Contract. Notwithstanding anything to the contrary in the Contract
Documents, Seller will provide only materials ready to set and will not provide shelf angles, caulking, testing, engineering, support steel, mockups or setting.

Seller's Standard Anchors are Included: ☐ NO  ☒ YES        Seller's Shop Drawings are Included: ☐ NO  ☒ YES

Price: $182,283.00          Tax: $0.00          Total Amount: $182,283.00 USD

Materials to be delivered F.O.B.   Calumet Park, IL          NOTE: Change of delivery address may affect applicable tax rate.
                              City, State, ZIP Code
☒ . Above price(s) DO NOT include applicable State or Local Taxes. However, all State & Local Taxes are to be added to the price shown to
establish Contract price unless an appropriate exemption, direct pay, or resale certificate is provided. **TAX EXEMPT NO.**

PAYMENT TERMS:        See attached Addendum "A-1/ dated February 22, 2006
(Subject to Credit Approval)

1) Approximate delivery is scheduled for week of Spring 2007/ If construction is delayed past spring/summer of
2007 by owner, Cold Spring Granite reserves the right to increase the contract amount to reflect current
construction costs.
2) Time required to complete shop drawings/tickets is 2 weeks after signed contract is received.
3) 2 weeks allowed for approval of drawing/tickets after being sent to customer if required.
4) 4 weeks required for fabrication after approval of drawings or tickets by the customer.

**THIS PROPOSAL & CONTRACT FOR MATERIAL INCORPORATES ALL OF THE TERMS & CONDITIONS
PRINTED ON THE FRONT OF THIS DOCUMENT AND/OR INCLUDING ANY ATTACHMENTS.**
Buyer hereby accepts Seller's offer to sell and agrees to perform in accordance with all terms and conditions. Buyer, by acceptance of the first delivery of material
will be deemed to have accepted all terms and conditions contained herein regardless of whether this document has been executed by Buyer.

ACCEPTED BY BUYER: Cedar Park Cemetery

*Cedar Park Cemetery*
BUYER

*Carolyn R. Fawns*   3.28.06
SIGNATURE/(Officer or Authorized Rep)    DATE

GRANIT BRONZ DIVISION OF COLD SPRING GRANITE COMPANY

Lisa Bjiold   *Lisa Bjiold*   3-28-06
PROPOSED BY:                    SALESPERSON

*Gary Thelsen*   7/6/06
ACCEPTED By: Gary Thelsen, Asst. Treasurer    DATE

GB-001 (Oct 98)
REF: WI-GE-019



# COLD SPRING GRANITE MEMORIAL GROUP

A Division of Cold Spring Granite Company
202 South Third Avenue, Cold Spring, MN 56320 USA
www.coldspringgranite.com

### Addendum "A-3"
### 216 Crypt Garden Mausoleum

March 8, 2006                                                 Page 1 of 3

1)  Granit-Bronz will include all granite material, crypts, vents, hangers, anchors, and necessary materials to construct one 216 Crypt Garden Mausoleum per Design 6344. Mausoleum will be 12 crypts wide x 6 crypts high with a mix of single and double depth crypts loading two sides.

2)  Roof areas over crypts will be granite slabs sealed with the highest quality caulking materials. Future roof maintenance will be limited to regular inspection and possible recaulking of joints.

3)  Granit-Bronz will contact an independent soil engineering company to perform soil testing. The foundation and upper structure drawings will be based on these results.

4)  Granit-Bronz will install the foundation. This proposal and pricing is based on reasonably level terrain and the soil having a bearing capacity of 2,500 PSF. In the event that the terrain is unusually rough or the soil test indicates that unusual foundation work or excavation of unusable soil and bringing in of fill will be necessary, any additional costs will be the responsibility of the Cemetery. An 8-foot sidewalk around the perimeter of the building is included. Granit-Bronz assumes the mausoleum can be built on a level site.

5)  Granit-Bronz assumes unusable soil and excavation materials can be disposed of at cemetery.

6)  Access to the construction site must be provided. Deliveries will be made with a 70' long tractor-trailer weighing 90,000 pounds. Route to construction site must be free of obstructions. (CEMETERY MAY NEED TO REMOVE TREES, ETC., TO PROVIDE ACCESS TO THE SITE.) Granit-Bronz is not responsible for damage to roadways or grade required for construction access, but will make every effort to avoid unusual damages.

7)  The purchaser is responsible for any costs involved with unusual obstructions, such as: gas lines, boulders, phone lines, etc that could be in the foundation area.



Granit-Bronz Mausoleum 800-328-5040 / Fax 320-685-5008
Construction Services Division 800-328-5040 / Fax 320-685-5008
Granit-Bronz 800-328-2312 / Fax 800-873-8122

gbmaus@coldspringgranite.com
Private Estates 800-328-5040 / Fax 320-685-5008
Royal Melrose 800-328-7021 / Fax 800-473-4881

 **COLD SPRING GRANITE MEMORIAL GROUP**

A Division of Cold Spring Granite Company
202 South Third Avenue, Cold Spring, MN 56320 USA.
www.coldspringgranite.com

Addendum "A-3"
216 Crypt Garden Mausoleum

March 8, 2006                                                                 Page 2 of 3

8)      Quality reinforced pre-cast modular crypts with 5,000 PSI and 28-day curing will be used.

9)      Polystyrene inner crypt closures will be provided for each crypt opening.

10)     Granite color selection:
        a) Polished ~~and Thermal~~ Sunset Red & Carnelian granite crypt fronts.  Ten extra crypt fronts will be shipped. (5 of each)
        b) Polished Carnelian granite mural. → Sunset Red        04-10-06 Grausch
        c) Thermal ~~Moonlight Gray~~ granite trim and end walls.
        d) Sawn Moonlight Gray granite roof stones.

11)     One 4'-2" x 8'-0" granite mural including carving from Granit-Bronz standard mural selection.

12)     Niches can added at a later date via change authorization once it is determined what quantity of niches is desired.

13)     Granite facing and trim will be anchored with stainless steel anchors including patented anchoring system developed by Cold Spring Granite Company.

14)     Granite fronts will be hung using Sinner Brother rosette hanging system.

15)     Dimensional cut granite jointing will be GE Silicone sealed.

16)     All crypts will be vented into an air plenum chamber within the mausoleum.

17)     Granit-Bronz will provide sales maps to assist in marketing.

18)     No electrical included.  No winter construction.

19)     Roof will drain through exterior aluminum bronze anodized downspouts.  Water to drain to ground level.  Cemetery is responsible for further drainage if required.

Granit-Bronz Mausoleum 800-328-5040 / Fax 320-685-5008        gbmaus@coldspringgranite.com
Construction Services Division 800-328-5040 / Fax 320-685-5008   Private Estates 800-328-5040 / Fax 320-685-5008
Granit-Bronz 800-328-2312 / Fax 800-873-8122                  Royal Melrose 800-328-7021 / Fax 800-473-4881

## COLD SPRING GRANITE MEMORIAL GROUP

A Division of Cold Spring Granite Company
202 South Third Avenue, Cold Spring, MN 56320  USA
www.coldspringgranite.com

Addendum "A-3"
216 Crypt Garden Mausoleum

March 8, 2006                                                        Page 3 of )

20)   Granit-Bronz 10-50 Worry-Free Warranty is included.

21)   Cemetery to supply water and electrical power supply to site for use during construction process.

22)   At any time up to and including the 24th month following the execution of this contract, the cemetery will make a determination whether sufficient crypts have been pre-sold to warrant the commencement of this project. If according to the cemetery's determination, the cemetery has not pre-sold enough crypts to warrant construction of a 216 crypt garden mausoleum, one of the following will occur, as determined by the cemetery: a. The commencement of the project will be delayed until the summer of 2008, or b. Cold Spring Granite agrees to re-design and revise contract accordingly.  c. The cemetery will have the option to cancel the contract with the understanding that any costs incurred at the time of cancellation will be deducted from the down payment.

23)   Cemetery is responsible for permits, landscaping, and memorialization.

24)   *Predrilling of crypt fronts with two holes for bronze memorialization and one hole for a bronze vase is included.  Granit-Bronz will honor a 10% discount for all-bronze nameplates, emblems, and vases purchased through Granit-Bronz.

25)   Payment terms:
   a) $9,114.00 due as a deposit with the signed contract.
   b) $82,028.00 prior to 1st shipment.  1st shipment is subject to the terms of item 22 above.
   c) Twelve equal monthly payments of $7,595.00 beginning 60 days after beginning of foundation. These monthly payments which total $91,140.00 will need to be secured by an irrevocable bank letter of credit that is approved by Granit-Bronz risk management prior to first shipment.

Granit-Bronz Mausoleum 800-328-5040 / Fax 320-685-5008
Construction Services Division 800-328-5040 / Fax 320-685-5008
Granit-Bronz 800-328-2312 / Fax 800-873-8122

gbmaus@coldspringgranite.com
Private Estates 800-328-5040 / Fax 320-685-5008
Royal Melrose 800-328-7021 / Fax 800-473-4881

# COLD SPRING GRANITE™

**COLD SPRING GRANITE COMPANY**, 17482 Granite West Road, Cold Spring, MN 56320-4578 USA
800-328-5040 320-685-3621 Fax 320-685-8490

## CHANGE AUTHORIZATION

Date: 05/28/2008

**REPLACEMENT PIECES:**
☐ Purchaser hereby pays the cost for the replacement pieces listed below.
☐ ADDITIONS   ☐ DELETIONS   ☒ MODIFICATIONS
   Purchaser hereby agrees to accept the changes specified and further agrees to pay the amounts as shown.

TO: Cedar Park Cemetery
ATTN: Rahsaan Brown
      12540 South Halsted Street
      Calumet Park, IL  60827

PHONE: 773-785-8840
FAX: 708-388-0051

JOB NO: 06-7541
   NAME: 216 Crypt Garden Mausoleum

LOCATION: Calumet Park, IL

| | AMOUNT |
|---|---|
| Addition of $12,760.00 due to current construction esculation cost. Building was originally scheduled to be built 2007. This has now changed to 2008. | $12,760.00 |

Shop Drawings  Weeks  Shop Tickets  Weeks ○ initial   ○ Partial   ○ Complete

Delivery:  Start delivery  weeks after receipt of approved shop drawings, cutting lists or shop tickets with all pertinent cutting information & signed Change Authorization. Balance of delivery per mutually agreed upon schedules for shop drawing submission, approvals, & fabrication time.

Please sign and return this Proposal & return via fax, this will authorize us to proceed.

| | |
|---|---|
| SUBTOTAL | $12,760.00 |
| TAX (%) | |
| TOTAL | $12,760.00 |

NOTE: This Change Authorization becomes part of and is specifically incorporated as a part of the existing contract and is subject to the same terms and conditions contained therein.

Please sign and return a copy of this form and retain a copy for your records.  No work will commence until this signed form is returned.

ACCEPTED BY BUYER: Cedar Park Cemetery

*Cedar Park Cemetery*
BUYER

*Carolyn R. Towns* 5.28.08
SIGNATURE/(Officer or Authorized Rep)   DATE

COLD SPRING GRANITE COMPANY

Lisa Bijold   *Lisa Bijold* 528-08
PROPOSED BY:           SALESPERSON

_____   _____
                        DATE

CS-031-2(12Feb08))



**COLD SPRING GRANITE COMPANY**, 17482 Granite West Road, Cold Spring, MN  56320-4578 USA
800-328-5040 320-685-3621 Fax 320-685-8490

# CHANGE AUTHORIZATION

Date:05/13/2009

REPLACEMENT PIECES:
- ☐ Purchaser hereby pays the cost for the replacement pieces listed below.
- ☒ ADDITIONS    ☐ DELETIONS    ☐ MODIFICATIONS
  Purchaser hereby agrees to accept the changes specified and further agrees to pay the amounts as shown.

| | |
|---|---|
| TO: Cedar Park Cemetery<br>ATTN: Rahsaan Brown<br>12540 South Halsted Street<br>Calumet Park, IL  60827<br><br>PHONE: 773-785-8840<br>FAX: 708-388-0061 | JOB NO: 06-7541<br>NAME: 216 Crypt Garden Mausoleum<br><br><br>LOCATION: Calumet Park, IL |

|  | **AMOUNT** |
|---|---|
| Addition of a row of oversized shelfs (18 crypts) | $2,440.00 |

Shop Drawings  Weeks   Shop Tickets   Weeks  ○ Initial      ○ Partial     ● Complete

**SUBTOTAL**
$2,440.00

Delivery:  Start delivery  weeks after receipt of approved shop drawings, cutting lists or shop tickets with all pertinent cutting information & signed Change Authorization. Balance of delivery per mutually agreed upon schedules for shop drawing submission, approvals, & fabrication time.

**TAX**
(%)

Please sign and return this Proposal & return via fax, this will authorize us to proceed.

**TOTAL**
$2,440.00

NOTE: This Change Authorization becomes part of and is specifically incorporated as a part of the existing contract and is subject to the same terms and conditions contained therein.

Please sign and return a copy of this form and retain a copy for your records.  No work will commence until this signed form is returned.

ACCEPTED BY BUYER:  Cedar Park Cemetery

**COLD SPRING GRANITE COMPANY**

Lisa Bijold
PROPOSED BY:                        SALESPERSON

BUYER

SIGNATURE: (Officer or Authorized Rep)        DATE

DATE

CS-031-2(12Feb08))

## SCHEDULE 9(B)2 TO SALE AGREEMENT
## DATED MARCH 15, 2010

**Lists of reserved lot obligations excluded from copy of Agreement
attached to Bankruptcy Court order dated April 27, 2010**